FIFTH DIVISION

Nos. 1-08-2438 and 1-09-2180, cons.

| | | |
|---|---|---|
| SHORELINE TOWERS CONDOMINIUM | ) | |
| ASSOCIATION, an Illinois | ) | |
| Not-For-Profit Corporation, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | |
| DEBRA GASSMAN, an Individual, | ) | 07CH06273 |
| | ) | |
| Defendant-Appellee, | ) | |
| | ) | The Honorable |
| (Edward Frischholz, as President of | ) | Kathleen M. Pantle, |
| the Board of Directors of the | ) | Judge Presiding. |
| Shoreline Towers Condominium Association, | ) | |
| | ) | |
| Plaintiff). | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Appellant Shoreline Towers Condominium Association (Shoreline) appeals from orders

of the circuit court dismissing with prejudice various counts of its complaint against appellee

Debra Gassman (Gassman) pursuant to section 2-619 of the Code of Civil Procedure (Code) (735

ILCS 5/2-619 (West 2008)), and assessing attorney fees against it.  We affirm.

BACKGROUND

Gassman is a former resident of Shoreline, a condominium building located at 6301

North Sheridan Road in Chicago.  While still a resident, Gassman, who is of the Jewish faith,

Nos. 1-08-2438 & 1-09-2180 (cons.)

affixed a mezuzah to her doorpost. A mezuzah is a small box about six inches tall, one inch

wide, and one inch deep, housing a small scroll of parchment inscribed with passages from the

Torah.[1] In 2004, while Gassman was still a resident, a dispute arose between Gassman and

Shoreline when Shoreline interpreted a preexisting condominium association rule that prohibited

residents from placing personal objects of any sort in the common areas, including common

hallways and doorways, to preclude the display of a mezuzah.[2] Beginning in April 2004,

Shoreline "repeatedly removed" the mezuzah from the doorpost of Gassman's condominium.

Attempting to remedy the effects of this rule, Gassman filed several lawsuits alleging

religious discrimination. She filed a religious discrimination claim with the Illinois Department

of Human Rights, which was dismissed for lack of substantial evidence. She also filed a

religious discrimination complaint with the Office of the Attorney General of the State of Illinois,

which was subsequently closed pursuant to Shoreline's voluntary revision of its rules in

September 2005.[3] The revised rule states:

---

[1]See Bloch v. Frischholz, 587 F.3d 771, 772 (7th Cir. 2009), for a detailed description of

the mezuzah tradition.

[2]The rule at issue read, in pertinent part:

*"Hallways*

1. Mats, boots, shoes, carts or objects of any sort are

prohibited outside Unit doors."

[3]The record includes a November 2005 letter from the Civil Rights Bureau of the Office

of the Attorney General stating:

2

"Shoreline Towers Condominium Association

Revised Rule–9/22/05

**Mat's [*sic*] boots, shoes, carts or objects of any sort are prohibited outside unit entrance doors**, except that a resident may display a religious symbol, provided that:

    1. The display of any religious symbol is limited to one per unit; is limited to display on the door or doorframe of the resident's unit; and shall not exceed 16 inches (length) by 16 inches (width) and a depth of 4 inches, contain lights, sounds or project any odors, be potentially dangerous, be a historical relic, present political or religious proselytizing, be pornographic, or provoke, incite or have the effect of provoking, inciting or promoting hate;

    2. The resident will be and is responsible for any physical damage of any kind caused by the resident's display of a religious symbol under the rule;

---

"It has come to our attention that Shoreline Towers Condominium Association has amended its rules and bylaws to permit residents to hang mezuzahs on their doorposts if they so desire. We are pleased that the condominium association has ceased discriminating against its residents on the basis of religion. Accordingly, we will now close our investigation of this matter."

3. The resident is liable for all costs for putting up and taking down the religious symbol and shall be responsible for damages of any kind if the Association is required to remove for common element or limited common element repairs, maintenance, restoration, etc;

4. The resident will restore the common element/limited common element to its original condition upon vacating the unit or non-continuous use of the religious symbol; and

5. The religious symbol reflects the resident's sincerely held belief."

Gassman also filed a religious discrimination complaint with the City of Chicago Commission on Human Relations as well as a religious discrimination claim against Shoreline in the United States District Court for the Northern District of Illinois.

In December 2005, the City of Chicago passed an amendment to its Fair Housing Ordinance, prohibiting condominium associations from interfering with the religious observances of building tenants. Chicago Municipal Code §§ 5-8-020, 5-8-030 (2008). In April 2006, the State of Illinois enacted a law preventing condominium boards from interfering with the religious practices of building tenants, including interfering with "the attachment of religiously mandated objects to the front-door area of a condominium unit." 765 ILCS 605/18.4(h) (West 2008).

In March 2007, Shoreline filed a complaint against Gassman, titled: "Verified Complaint for Injunctive Relief, Defamation, Civil Conspiracy, Malicious Prosecution, Intentional Infliction

of Emotional Distress, and Civil Rights." According to Shoreline, Gassman waged a campaign of harassment and intimidation against Shoreline and used her position as an attorney in the office of the public defender to conspire with members of the Cook County sheriff's department and the Chicago police department (CPD) to further her purpose. Shoreline alleged that Gassman's behavior interfered with its day-to-day operations to such an extent that it was unable to allocate sufficient resources for the proper administration of the property.

Shoreline's allegations included, in pertinent part, that beginning in July 2005, Gassman supplied inaccurate and damaging information to the Jewish Star, a publication geared primarily to the Jewish community. Based on that information, the Jewish Star referred to Shoreline's rule as a "Mezuzah Ban" and Shoreline contended this characterization essentially labeled it anti-Semitic.

Shoreline further alleged that, in October 2005, Shoreline arranged for a charter bus to transport residents to a meeting regarding the development of a nearby marina. Residents were notified of this meeting via flyers that were handed out and posted in the common areas of the building. Shoreline alleged that Gassman tore down the signs posted in the lobby and shouted that Shoreline should not be having the meeting. She then argued with Edward Frischholz, the president of Shoreline's board of directors, in front of five witnesses.[4] The argument culminated in Gassman accusing Frischholz of threatening her with bodily harm. Gassman called the police after the argument. Responding CPD officers went into Gassman's condominium to speak with her. When Shoreline's property manager went to Gassman's condominium to check on the status

---

[4]Frischholz was a plaintiff in the case below, but is not a party to this appeal.

of the investigation, she saw multiple wine glasses on the coffee table where the police had been sitting with Gassman. No charges were filed.

Shoreline claims that, in December 2005, Gassman used her influence with the Congregation of Beth Shalom of East Rogers Park (congregation) to provoke an altercation between the congregation and Frischholz during a meeting in Shoreline's hospitality room. Frischholz displayed a crucifix on the door outside his unit and, allegedly, the congregation covered it with a garbage bag.

Shoreline claims that Gassman told the front desk clerk that Frischholz was receiving drug deliveries. She also told him she had friends on the police force who would be monitoring Frischholz and his guests for suspicious behavior. Soon after, the front desk clerk saw an unmarked police car in front of the property. Later, Gassman told the desk clerk that Frischholz had a homosexual lover. She also told the desk clerk that Frischholz was involved in litigation regarding alleged misconduct with one of his patients.

In April 2006, Gassman told a Shoreline employee she was being harassed. She told him about the pending litigation and warned him to stay away from Frischholz because he was a "bad person."

Based on the above facts, Shoreline filed its 10-count complaint in which it: requested an injunction against Gassman from interfering with its day-to-day operations (count I); alleged defamation against Shoreline (count II); requested an injunction against Gassman from defaming Shoreline's character and reputation (count III); alleged defamation of Frischholz regarding the alleged misconduct with his patient, being involved in drug trafficking, and telling the Jewish

Star that he was anti-Semitic (count IV); requested an injunction against Gassman from defaming Frischholz's character and reputation (count V); alleged the intentional infliction of emotional distress on the part of Frischholz (count VI); requested an injunction against Gassman from inflicting emotional distress upon Frischholz (count VII); alleged civil conspiracy where Gassman used her position as a public defender to conspire with members of the sheriff's department and the CPD (count VIII); alleged malicious prosecution for filing lawsuits after the Illinois Department of Human rights litigation was dismissed and where Shoreline prevailed on summary judgment in federal court regarding Gassman's religious discrimination claim and at trial regarding Gassman's retaliation claim (count IX); and alleged that Gassman used her position as a public defender in violation of section 1983 of the Civil Rights Act of 1964 (42 U.S.C. §1983 (2006)) (count X).

Gassman then filed a motion to dismiss (motion) pursuant to section 2-619, which is the subject of this appeal. In it, Gassman argued that the entire complaint should be dismissed pursuant to the Citizen Participation Act (the Act), also known as the Illinois Anti-Strategic Lawsuits Against Public Participation Act (Anti-SLAPP), the public policy of which states that "the constitutional rights of citizens and organizations to be involved and participate freely in the process of government must be encouraged and safeguarded with great diligence" and "[i]t is in the public interest and it is the purpose of this Act to strike a balance between the rights of persons to file lawsuits for injury and the constitutional rights of persons to petition, speak freely, and otherwise participate in government." 735 ILCS 110/5 (West 2008). Gassman contended that she brought her original claims against Shoreline because she believed she was the victim of

religious discrimination by Shoreline when it repeatedly removed her mezuzah from the doorpost of her condominium. Gassman argued that the amendment to the City of Chicago Fair Housing Ordinance as well as the enactment of the aforementioned Illinois law (765 ILCS 605/18.4(h) (West 2008)) that prevents condominium boards from interfering with the religious practices of building tenants was "a result, in part," of her actions in challenging Shoreline's conduct. According to Gassman, then:

"9. In the wake of, and in apparent retaliation for Gassman's successful effort to effect changes in [Shoreline's] discriminatory behavior, [Shoreline] filed their ten-Count Complaint against [Gassman]. Four Counts seek an injunction against Gassman's right of association and speech (Counts I, III, V, VII) and the remaining counts seek damages arising from activities protected by the statute: speech, association, exercise of religious freedom, and petitioning the government.

10. Therefore, the entire lawsuit is clearly in response to the acts of Gassman 'in furtherance of [her] rights of petition, speech, association, or to otherwise participate in government' in clear violation of the Act. Gassman stood up in support of her Constitutional Rights as a U.S. citizen to practice her religion and successfully challenged what she believed to be improper and unlawful acts of Shoreline as directed by Frischholtz [*sic*].

Nos. 1-08-2438 & 1-09-2180 (cons.)

Plaintiffs' Complaint should, therefore, be dismissed."

The trial court agreed, in part, and found that Shoreline's lawsuit as to the association counts (counts I, II, III, VIII, IX, and X) was, in fact, a strategic lawsuit against public participation (a SLAPP suit). In doing so, it noted that there is scarce Illinois case law on the subject, and it drew guidance from cases decided by the courts of sister states.

The trial court denied the motion to dismiss as to counts IV, V, VI, and VII, the counts pertaining to Frischholz. Counts IV and V alleged defamation with regards to Frischholz. The court determined that, considering the allegations in the complaint in the light most favorable to the nonmovant, Shoreline had sufficiently stated a claim for defamation to withstand a motion to dismiss. It noted that "Anti-SLAPP legislation is not intended to protect those who actually commit torts" but to "protect those who are in danger of being sued solely because of their valid attempts to petition the government."

Counts VI and VII alleged intentional infliction of emotional distress with regard to Frischholz. Specifically, the court determined that the facts were plead sufficiently for those counts to survive a motion to dismiss, and Gassman's alleged behavior was "not of the type contemplated to be protected by the Act."

Shoreline appeals the dismissal of counts I, II, III, VIII, IX, and X.[5]

ANALYSIS

Strategic Lawsuit Against Public Participation (SLAPP)

A section 2-619 motion to dismiss admits the legal sufficiency of the plaintiff's

_____

[5]The Anti-Defamation League has filed an *amicus* brief in support of Gassman.

9

complaint but asserts affirmative defenses or other matter that avoids or defeats the plaintiff's claim. DeLuna v. Burciaga, 223 Ill. 2d 49, 59 (2006). An " '[a]ffirmative matter' is something in the nature of a defense that completely negates the cause of action or refutes crucial conclusions of law or conclusions of material fact contained in or inferred from the complaint." Golden v. Mullen, 295 Ill. App. 3d 865, 869 (1997). All properly pleaded facts are accepted as true and a reviewing court is concerned only with the question of law presented by the pleadings. Thornton v. Shah, 333 Ill. App. 3d 1011, 1019 (2002). Rulings on section 2-619 motions are reviewed *de novo*. DeLuna, 223 Ill. 2d at 59.

Initially, Shoreline contends the trial court erred where it determined that Shoreline's lawsuit was a SLAPP suit. Specifically, Shoreline argues that SLAPP suits are "lawsuits brought to silence public outcry regarding issues of significant public concern," and it characterizes SLAPP suits as actions brought against "a person or group [who] was using a public forum to voice an opinion regarding a public issue." It suggests that "[i]t could hardly be argued that [Gassman's] campaign of defamation, tortious interference, harassment, intimidation, and personal attacks, as to the affairs of a private condominium association, and against the members of the Board personally, rises to the level of an ongoing attempt to petition a governmental entity for public redress." We disagree.

The Citizen Participation Act, commonly known as the Illinois Anti-Strategic Lawsuits Against Public Participation Act or Anti-SLAPP law, was enacted on August 28, 2007. 735 ILCS 110/1 (West 2008) (hereinafter the Act). "The Act aims to protect defendants from 'Strategic Lawsuits Against Public Participation' (SLAPPs), which harass citizens for exercising

Nos. 1-08-2438 & 1-09-2180 (cons.)

constitutional rights, such as the right to petition the government." Mund v. Brown, 393 Ill. App. 3d 994, 995 (2009). The public policy behind the Act, as noted above, states that "the constitutional rights of citizens and organizations to be involved and participate freely in the process of government must be encouraged and safeguarded with great diligence." 735 ILCS 110/1 (West 2008). The General Assembly was expansive when describing the goals and scope of the Act:

> "Pursuant to the fundamental philosophy of the American constitutional form of government, it is declared to be the public policy of the State of Illinois that the constitutional rights of citizens and organizations to be involved and participate freely in the process of government must be encouraged and safeguarded with great diligence. The information, reports, opinions, claims, arguments, and other expressions provided by citizens are vital to effective law enforcement, the operation of government, the making of public policy and decisions, and the continuation of representative democracy. The laws, courts, and other agencies of this State must provide the utmost protection for the free exercise of these rights of petition, speech, association, and government participation.

> Civil actions for money damages have been filed against citizens and organizations of this State as a result of their valid

11

exercise of their constitutional rights to petition, speak freely, associate freely, and otherwise participate in and communicate with government. There has been a disturbing increase in lawsuits termed 'Strategic Lawsuits Against Public Participation' in government or 'SLAPPs' as they are popularly called.

The threat of SLAPPS significantly chills and diminishes citizen participation in government, voluntary public service, and the exercise of these important constitutional rights. This abuse of the judicial process can and has been used as a means of intimidating, harassing, or punishing citizens and organizations for involving themselves in public affairs.

It is in the public interest and it is the purpose of this Act to strike a balance between the rights of persons to file lawsuits for injury and the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government; to protect and encourage public participation in government to the maximum extent permitted by law; to establish an efficient process for identification and adjudication of SLAPPs; and to provide for attorney's fees and costs to prevailing movants." 735 ILCS 110/5 (West 2008).

The Act applies to any claim that "is based on, relates to, or is in response to any act or

acts of the moving party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government." 735 ILCS 110/15 (West 2008). It protects citizens in the exercise of their constitutional rights of participation, directing that: "[a]cts in furtherance of the constitutional rights to petition, speech, association, and participation in government are immune from liability, regardless of intent or purpose, except when not genuinely aimed at procuring favorable government action, result, or outcome." 735 ILCS 110/15 (West 2008). The Act provides that the court shall grant a motion to dismiss "unless the court finds that the responding party has produced clear and convincing evidence that the acts of the moving party are not immunized from, or are not in furtherance of acts immunized from, liability by this Act." 735 ILCS 110/20(c) (West 2008). The Act "shall be construed liberally to effectuate its purposes and intent fully." 735 ILCS 110/30 (West 2008).

There is no distinct formula for determining whether a particular lawsuit is a SLAPP suit. See Tate, *California's Anti-SLAPP Legislation: A Summary of and Commentary on its Operation and Scope*, 33 Loy. L.A. L. Rev. 801, 804-05 (April 2000) ("The most frequent type of SLAPP suit is for defamation, but the causes of action are myriad. They include business torts (such as interference with contractual rights or with prospective economic advantage), anti-trust, intentional infliction of emotional distress, invasion of privacy, civil rights violations, constitutional rights violations, conspiracy, nuisance, judicial process abuse, and malicious prosecution").

Contrary to Shoreline's argument, the Act does not protect only public outcry regarding matters of significant public concern, nor does it require the use of a public forum in order for a

citizen to be protected. Rather, it protects from liability all constitutional forms of expression and participation in pursuit of favorable government action.

Shoreline alleges as grounds for liability, in pertinent part, that Gassman filed religious discrimination complaints against Shoreline for barring her display of a mezuzah on her doorpost; that Gassman supplied information to the Jewish Star which Shoreline alleges contained false characterizations of its policies; and that Gassman discussed her claims with Shoreline's employees. Shoreline's complaint, at least in regards to the counts involving the Association, was a SLAPP suit, as it was clearly predicated upon acts of petition, speech, association, and participation by Gassman in pursuit of a favorable government action, which is protected by the Act.

Moreover, Shoreline's argument lacks merit when viewed in conjunction with the many changes made, in part, in response to defendant's claims: Shoreline modified its rules to allow the display of religious objects on the doorposts of residents' condominiums, the City of Chicago amended its Fair Housing Ordinance to prevent condominium boards from interfering the with the religious practices of building tenants, and the State of Illinois enacted a law also preventing condominium boards from interfering with tenants' religious practices, including interference with religious objects placed on the doorposts of a condominium.

Shoreline also argues that its lawsuit should not be construed as a SLAPP suit because it "is not meant or calculated to quell or stop [Gassman] from further demonstration or outcry." We disagree, as the Act does not require a lawsuit be filed while protected conduct is ongoing in order to qualify as a SLAPP suit. Rather, the Act expressly provides that it applies to a claim

14

brought "in response to any act or acts" in furtherance of constitutional rights. 735 ILCS 110/15 (West 2008) ("[the] Act applies to any motion to dispose of a claim in a judicial proceeding on the grounds that the claim is based on, relates to, or is in response to any act or acts of the moving party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government").

Retroactivity

Next, Shoreline contends that the trial court erred by applying the Act retroactively. Specifically, Shoreline argues that the Act should not have applied to its complaint, where the complaint was filed in March 2007 and the Act did not become effective until August 2007. We disagree.

The Act "shall be construed liberally to effectuate its purposes and intent fully." 735 ILCS 110/30(b) (West 2008). Although Illinois courts have not discussed retroactivity regarding the Act, we have held that "statutes and amendatory acts are presumed to operate prospectively unless the statutory language is so clear as to admit of no other construction. An exception to this general rule is that statutes or amendments which relate only to remedies or forms of procedure are given retrospective application." People v. Theo, 133 Ill. App. 2d 684, 687 (1971). Because there is no Illinois case law regarding the retroactive application of the Act, we draw guidance from cases decided by the courts of sister states. California courts addressing this issue have found that the California anti-SLAPP statute is procedural and, as such, may be applied retroactively. See Soukup v. Law Offices of Herbert Hafif, 39 Cal. 4th 260, 280, 139 P. 3d 30,

15

43, 46 Cal. Rptr. 3d 638, 653 (2006), quoting Brenton v. Metabolife International, Inc., 116 Cal. App. 4th 679, 689, 10 Cal. Rptr. 3d 702, 709 (2004) ("The anti-SLAPP statute is a procedural statute, the purpose of which is to screen out meritless claims. [Citation.] It is well settled that 'applying changed procedural statutes to the conduct of existing litigation, even though the litigation involves an underlying dispute that arose from conduct occurring before the effective date of the new statute, involves no improper retrospective application because the statute address conduct in the future' "); Ingels v. Westwood One Broadcasting Services, Inc., 129 Cal. App. 4th 1050, 1065, 28 Cal. Rptr. 3d 933, 942 (2005) (" 'The new [anti-SLAPP] statute applies to lawsuits brought before its effective date because it constituted a procedural change regulating the conduct of ongoing litigation and thus triggered no retroactivity concerns' "), quoting Mann v. Quality Old Time Service, Inc., 120 Cal. App. 4th 90, 112, 15 Cal. Rptr. 3d 215, 228 (2004).

Applying the Illinois retroactivity standards, examining the reasoning used by the California courts, and being cognizant of the legislature's mandate to apply the Act liberally (the Act "shall be construed liberally to effectuate its purposes and intent fully" (735 ILCS 110/30(b) (West 2008))), we find that the Act is procedural in nature and applies to the instant SLAPP lawsuit. The trial court did not err in its dismissal of counts I, II, III, VIII, IX, and X.

Shoreline also contends that the trial court abused its discretion in denying it leave to amend the complaint after the complaint was dismissed. Specifically, Shoreline argues that its motion for clarification of dismissal order was actually a request to amend the complaint so that the association counts would fall outside of the Act. A review of the record on appeal, however, shows this was not the case. Rather, following the dismissal of counts I, II, III, VIII, IX, and X,

16

Nos. 1-08-2438 & 1-09-2180 (cons.)

Shoreline filed a motion for clarification, seeking clarification as to whether the dismissal was with prejudice or without prejudice, stating:

> "5. The Order failed to include 304(a) language, expressly
>
> stating that there is no just reason for delay of appeal by either
>
> party as to the dismissal of [Shoreline's] claims."

It specifically requested an order clarifying whether the dismissal was with or without prejudice; an order including Rule 304(a) language; or an order "identifying the question of law" as to those counts; and "such other and further relief as this Honorable Court deems just and proper." The motion for clarification did not request leave to amend the complaint, nor was it accompanied by an amended complaint.


Attorney Fees

Next, Shoreline contends that the trial court erred by: (1) awarding attorney fees where the Act was not effective at the time the complaint was filed; and (2) awarding attorney fees for case matters unrelated to the Act. We disagree.

As a threshold matter, we wish to clarify our standard of review in this case. There are two orders at issue here. The first, entered December 19, 2008, determined that an award of attorney fees was proper and set a date for further proceedings to determine the amounts to be awarded. Our review of this order is *de novo*. People v. Blanks, 361 Ill. App. 3d 400, 407 (2005) (matters of statutory interpretation are reviewed *de novo*). Our review of the second order at issue, the final fee order which determined the dollar amount of the award, is abuse of

17

Nos. 1-08-2438 & 1-09-2180 (cons.)

discretion. See Harris Trust & Savings Bank v. American National Bank &Trust Co. of Chicago, 230 Ill. App. 3d 591, 595-96 (1992) ("Once the trial court makes a determination as to the reasonableness of attorney fees and related costs, that determination will not be disturbed absent an abuse of discretion"). Accordingly, we will reverse the amount of attorney fees only if no reasonable person would make the same decision as the trial court. DeLapaz v. Selectbuild Construction, Inc., 394 Ill. App. 3d 969, 972 (2009).

We first address whether the award of attorney fees is appropriate under the Act. Section 25 of the Act provides that the court shall award the prevailing moving party reasonable attorney fees and costs incurred "in connection with the motion." 735 ILCS 110/25 (West 2008). The court issued three opinions with respect to fees and, ultimately, a final order awarding fees. In December 2008, the court concluded that Gassman's attorneys, Seyfarth Shaw, were entitled to fees. In March 2009, the court entered an order approving Seyfarth Shaw's billing time entries as stated in its fee petitions with several exceptions. In June 2009, the court entered its order fixing the rates of plaintiffs' attorneys as the reasonable rates to be used in calculating Seyfarth Shaw's fees. Thereafter, the parties applied the rates approved by the court to the time approved by the court, and the court awarded Gassman fees of $36,840.

"Illinois generally characterizes attorney fees as procedural for retroactivity purposes and applies new attorney fees statutes to pending cases." Callinan v. Prisoner Review Board, 371 Ill. App. 3d 272, 275 (2007). However, the court will not apply an attorney fee statute retroactively where: "(1) liability did not exist prior to enactment of the legislation; (2) the conduct giving rise to possible liability occurred prior to the statute's effective date; and (3) the party against whom

18

expenses were sought could not avoid or limit its liability by any action taken after the statute's effective date." Board of Education of School District No. 170 v. Illinois State Board of Education, 122 Ill. App. 3d 471, 477 (1984).

Here, Shoreline fails the third factor, as it had sufficient notice of the attorney fee statute and could have avoided or limited its liability after such notice. On October 19, 2007, prior to filing the motion to dismiss, Gassman's attorneys sent Shoreline a letter informing it of the Act, giving them notice that their complaint violated the Act, and advising them of her intention to seek relief under the Act. That letter stated, in relevant part, that if the complaint was not voluntarily dismissed, Gassman would seek to dismiss the complaint:

> "pursuant to the Citizen Participation Act * * *. Concomitantly,
> and pursuant to the Act, we will seek, among other things, the
> imposition of all of the attorneys' fees and costs incurred in
> connection with any such motion."

At that point, Shoreline was put on notice that Gassman would pursue her rights under the Act, which included seeking attorney fees. Shoreline, rather than limiting its liability, chose to respond by letter on October 23, 2007, that the Act did not apply, and it threatened sanctions:

> "While I appreciate your advocacy, I disagree that the Act applies to
> this matter for reasons which will be raised in our response should
> you wish to argue this position. Further, in order to avoid potential
> sanctions, I strongly suggest you review the applicably [*sic*] of the
> Act before attempting to apply it to this matter."

19

On November 14, 2007, Gassman moved to dismiss Shoreline's complaint because it violated the Act.

Shoreline cannot satisfy the third factor announced in <u>Board of Education</u>,122 Ill. App. 3d at 477, because, although it was not put on notice of its potential liability for attorney fees at the time its complaint was filed, it was put on notice prior to Gassman filing the motion to dismiss. We note that Seyfarth Shaw appropriately sought only fees associated with the motion to dismiss which were incurred after Shoreline was put on notice and after the enactment of the Act. Shoreline's conduct giving rise to the fee award was not its initial filing of the complaint, but its continued pursuit of the case after the statute became effective and after it was put on notice of the Act. Shoreline knew of the potential liability for fees prior to the motion to dismiss being filed and had the opportunity to avoid liability. Accordingly, the trial court properly determined that attorney fees should be awarded.

We now consider whether the amount of attorney fees awarded by the trial court was appropriate. Shoreline argues on appeal that the trial court improperly awarded fees incurred for services unrelated to the motion to dismiss, that the trial court's award was excessive, and that the billing records before the trial court were not detailed enough to support a fee petition. We disagree and find no abuse of discretion in the trial court's award of attorney fees. "A petition for fees must present the court with detailed records containing facts and computations upon which the charges are predicated specifying the services performed, * * * the time expended and the hourly rate charged." <u>Harris Trust & Savings Bank</u>, 230 Ill. App. 3d at 595. To determine whether an award of attorney fees is reasonable, we consider the "skill and standing of the

20

attorneys employed, the nature of the case, the novelty and difficulty of the issues involved, the degree of responsibility required, the usual and customary charge of the same or similar services in the community, and whether there is a reasonable connection between the fees charged and the litigation." Harris Trust & Savings Bank, 230 Ill. App. 3d at 595.

Our review of the record convinces us that the fee petitions are adequately specific to support the trial court's award of attorney fees such that the trial court's award of fees was not an abuse of discretion. Specifically, the trial court reviewed the "skill and standing of the attorneys employed," noting that William Goldberg of Seyfarth Shaw was the lead counsel for Gassman. The court noted that he is a graduate of Harvard Law School and a senior partner at the law firm. He concentrates his practice in complex commercial litigation matters and demonstrated considerable skill in front of the court. It noted that Goldberg was assisted by two other attorneys who "participated to some extent and billed for a modest amount of hours."

The court also stated that Seyfarth Shaw "has tendered a detailed Petition and Supplemental Petition for Attorney Fees and Costs. Seyfarth Shaw has also provided a sufficient explanation for the involvement of multiple attorneys on this case. The law firm has also provided for the Court's review a copy of the detailed time sheets with highlighted entries."

The court also evaluated the nature of the case, the novelty and difficulty of the issues involved, and the degree of responsibility required. In so doing, it noted that this was a "case of first impression and the application of a recently-enacted statute. The issues presented were new to Illinois courts though courts in sister jurisdictions have ruled on similar issues. The matter is important as it involves a citizen's exercise of her rights in federal court."

21

With respect to rates, the trial court determined that the initial rates submitted by Seyfarth Shaw were not appropriate, as some of the attorneys involved concentrated their practice in complex commercial litigation, and "this case is not a commercial litigation case; it is essentially a tort case with complicated motion practice." The trial court ordered Seyfarth Shaw to submit a declaration from an attorney with a practice concentrated in that area. Eventually, the trial court ruled that the usual and customary charges billed by Shoreline's counsel were the rates to be used in calculating Seyfarth Shaw's fees. The trial court concluded: "As the court is to determine the usual and customary charges for the same or similar services in the community, the court will use the usual and customary charge billed by [Shoreline's] counsel, i.e. the partnership rate is $350.00; the senior associate rate is $270.00 and the associate rate is $235.00 The court has reviewed the submissions by [Shoreline's] counsel and finds that fees charged by [Shoreline's] counsel are the usual and customary charges charged by lawyers in Cook County for the same or similar services."

Seyfarth Shaw had requested approximately $52,000 in fees. The trial court, using the usual and customary charges submitted by Shoreline's counsel, awarded $36,840.

Our review of the record shows that the trial court carefully reviewed the detailed fee petitions submitted by Seyfarth Shaw, scrutinized the skill and standing of the attorneys involved, was cognizant of the nature of the case, the novelty and difficulty of the issues involved and the degree of responsibility required. The court questioned the hourly rate submitted and reduced the hourly rate to one that was consistent with the usual and customary charge of same or similar services provided in Cook County. The court awarded fees only for services rendered

22

after the enactment of the Act.

We are equally unpersuaded by Shoreline's argument that the trial court erred by awarding fees for work that was merely related to the motion to dismiss. Section 25 of the Act provides that the court shall award the prevailing moving party reasonable attorney fees and costs incurred "in connection with the motion." 735 ILCS 110/25 (West 2008). The Act's stated purpose is to deter SLAPP suits, and it should be construed liberally in this pursuit. See 735 ILCS 110/30 (West 2008). Allowing litigants to undercut the deterrent purpose following the grant of a motion to dismiss by filing motions for which they would have no risk of being assessed fees would frustrate this purpose. See McNiff v. Mazda Motor of America, Inc., 384 Ill. App. 3d 401, 406-08 (2008) (awarding legal fees incurred in connection with motion for reconsideration, although statute only provided for costs "incurred in the prosecution of the action"). We find no error here, where we believe the legislature intended the words "in connection with the motion" to include proceedings which relate to, and are a consequence of, the grant of the motion.


CONCLUSION

For the foregoing reasons, the decision of the circuit court of Cook County is affirmed.

Affirmed.


TOOMIN and HOWSE, JJ., concur.


23

Nos. 1-08-2438 & 1-09-2180 (cons.)

**REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**
**(Front Sheet to be Attached to Each Case)**

Please use the following form

SHORELINE TOWERS CONDOMINIUM ASSOCIATION, an Illinois Not-For-Profit Corporation,

Plaintiff-Appellant,

v.

DEBRA GASSMAN, an Individual,

Defendant-Appellee,

(Edward Frischholz, as President of the Board of Directors of the Shoreline Towers Condominium Association, an Illinois Not-For-Profit Corporation,

Plaintiff).

Docket No.

No. 1-08-2438 & 1-09-2180

COURT
Opinion
Filed

Appellate Court of Illinois
First District, FIFTH Division

September 30, 2010
(Give month, day and year)

JUSTICES

PRESIDING JUSTICE JAMES FITZGERALD SMITH DELIVERED THE OPINION OF THE COURT:
TOOMIN and HOWSE, JJ., concur.

APPEAL from the Circuit Court of Cook County; the Hon_____ Judge Presiding.

Lower Court and Trial Judge(s) in form indicated in margin:

Appeal from the Circuit Court of Cook County.

The Hon. Kathleen M. Pantle, Judge presiding.

FOR APPELLANTS
John Doe, of Chicago

For APPELLEES, :

Indicate if attorney represents APPELLANTS or APPELLEES and include attorney's of counsel. Indicate the word or NONE if not represented.

APPELLANT: DAVID C. HARTWELL, JOONHO YU, PENLAND & HARTWELL, LLC, Chicago, IL

Smith and Smith of Chicago,
Chicago, IL

APPELLEE: WILLIAM I. GOLDBERG, M. RYAN PINKSTON, ALEKA L. JONES, SEYFARTH SHAW, LLP, Chicago, IL

(Joseph Brown, of counsel)
Add attorneys for third-party appellants and/or appellees.

24