2014 IL App (1st) 112219

FIRST DIVISION
FEBRUARY 3, 2014

Nos. 1-11-2219, 1-11-2258, 1-12-2476, 1-12-2715, Consolidated

| | | |
|---|---|---|
| *In re* ESTATE OF ERLA FEINBERG, Deceased | ) | |
| | ) | |
| (Michele Trull, Plaintiff-Appellant and Cross-Appellee, | ) | Appeal from the |
| v. Leila Taylor, Marshall Taylor and Michael Feinberg, | ) | Circuit Court of |
| Defendants-Appellees and Cross-Appellants). | ) | Cook County. |
| _____ | ) | |
| | ) | |
| FIFTH THIRD BANK, as Trustee under the Trusts of | ) | |
| Erla Feinberg and Max Feinberg, | ) | |
| | ) | Nos. 04 L 7195 |
| Petitioner-Appellant, | ) | 04 P 5093 |
| | ) | 05 P 0173 |
| v. | ) | |
| | ) | |
| LEILA R. TAYLOR, Individually and as Coexecutor of | ) | |
| the Will of Erla Feinberg, Deceased; MICHAEL B. | ) | |
| FEINBERG, Individually and as Coexecutor of the Will | ) | Honorable |
| of Erla Feinberg, Deceased; and MARSHALL TAYLOR, | ) | Susan M. Coleman, |
| | ) | Judge Presiding. |
| Respondents-Appellees. | ) | |

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Justices Hoffman and Delort concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a bench trial in the circuit court of Cook County, the trial court entered a May 16, 2011 judgment, pursuant to a citation to recover assets filed by petitioner Fifth Third Bank as trustee of the Erla Feinberg Trust, against respondent Michael Feinberg in the amount of $788,957 and against respondents Leila and Marshall Taylor in the amount of $1,911,107. The May 16,

2011 order also found that Fifth Third Bank's recovery of assets to the Erla Feinberg Trust was an adequate remedy to the relief sought by plaintiff Michele Trull in an action alleging misappropriation of funds against defendants Michael Feinberg, Leila Taylor and Marshall Taylor. On August 10, 2012, the trial court entered an order approving Fifth Third Bank's proposed plan of distribution of the assets in the Max Feinberg Trust and the Erla Feinberg Trust. On appeal, Leila and Marshall Taylor challenge the trial court's May 16, 2011 order, which ordered them to return $1,911,107 to the Erla Feinberg Trust, and they challenge the trial court's August 10, 2012 order granting Fifth Third Bank's proposed plan of distribution of the assets. Michele Trull also appeals the May 16, 2011 and August 10, 2012 orders. On cross-appeal, Fifth Third Bank argues that the trial court erred in denying its request for prejudgment interest on the recovered assets. Michael Feinberg does not appeal the trial court's May 16, 2011 ruling, which ordered him to return $788,957 to the Erla Feinberg Trust. For the following reasons, we affirm in part and reverse in part the judgment of the circuit court of Cook County.

¶ 2                                   BACKGROUND

¶ 3     This case involves an extremely complex factual and procedural background, and thus, our recitation of the facts is limited to those that are pertinent to our resolution of this appeal. On December 4, 1986, Max Feinberg (Max) died. Max was survived by his wife, Erla Feinberg (Erla), and their two adult children, Michael Feinberg (Michael) and Leila Taylor (Leila). Michael is married to Marcy Feinberg (Marcy).[1] Michael has two adult children from his prior marriage: Michele Trull (Michele) and Aron Feinberg (Aron). Leila is married to Marshall

---

[1]The spelling of Marcy's name varies throughout the record.

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

Taylor (Marshall) (collectively, the Taylors). The Taylors, who have lived in California since 1969, have three adult children: Jon Taylor (Jon), Aimee Taylor Severe (Aimee) and Lisa Taylor Schroeder (Lisa).

¶ 4 At the time of Max's death in 1986, Max and Erla each had a trust (collectively, the Feinberg Trusts), and their estate plans were mirror images of one another. The Max Feinberg Trust (the Max Trust) provided that upon Max's death and after payment of expenses, the trustee shall allocate the trust corpus into two separate trusts for tax reasons–"Trust A" and "Trust B." Both Trust A and Trust B were designed to provide for the "support, medical care and welfare" of Erla during her lifetime. The Max Trust provided that upon the death of Erla, the assets of Trust A and Trust B would be distributed amongst their children and grandchildren. The Max Trust also granted Erla a limited lifetime power of appointment to distribute the assets of Trust B to her descendants. Both the Max Trust and the Erla Feinberg Trust (the Erla Trust) contained what the parties refer to as the "Jewish clause," which stated that any descendant, other than Michael and Leila, who married outside of the Jewish faith would be deemed deceased for the purposes of the trust instrument as of the date of the marriage. In September 1984, Max and Erla executed a first amendment to the Feinberg Trusts, which amended the Jewish clause to permit a non-Jewish spouse to convert to Judaism within one year of the marriage.

¶ 5 On June 29, 1994, Erla signed a durable power of attorney naming her children, Michael and Leila, as her agents.

¶ 6 On July 23, 1997, Erla exercised her lifetime power of appointment (the 1997 appointment) over the Max Trust, directing that, upon her death, Michael and Leila and any of her

grandchildren who were not deemed deceased under the Max Trust, shall receive $250,000 from the Max Trust. The 1997 appointment specified that "[i]f any of my grandchildren are deemed deceased then the [$250,000 share] shall be paid equally to the parents of that grandchild." On that same day, July 23, 1997, Erla executed a second amendment to the Erla Trust (the second amendment), which deleted the Jewish clause from her own trust and directed that, immediately upon her death, a sum of $100,000 be distributed to each of her five grandchildren–Michele, Aron, Jon, Aimee and Lisa.

¶ 7    On October 1, 2003, Erla died. By the time of Erla's death, all five grandchildren had been married for more than one year. Only Marshall and Leila's son, Jon, met the condition of the Jewish clause and was entitled to receive $250,000 from the Max Trust, as directed by Erla's 1997 appointment.

¶ 8    In 2004, Michele filed a lawsuit against Michael and the Taylors in the law division of the circuit court of Cook County, alleging that they misappropriated millions of dollars in assets from Max's and Erla's estates (case No. 04 L 7195).[2] In the third amended complaint, Michele alleged counts for intentional interference with testamentary expectancy (counts I and II), conspiracy by the Taylors and Michael to intentionally interfere with testamentary expectancy (count III), and requested that a constructive trust be imposed against Michael and the Taylors for assets and funds which they had misappropriated from Erla and from the estates of Max and Erla (count IV). Michael and the Taylors sought to dismiss the lawsuit on the basis that Michele had no interest in Max's estate because she was deemed deceased under the provision of the Jewish clause in the

_____

[2] Michele's 2004 law division case was consolidated with two probate cases concerning the probate of Erla's estate (case No. 04 P 5093) and the probate of Max's estate (case No. 05 P 0173).

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

Max Trust. The trial court held that the Jewish clause was invalid on public policy grounds. On June 30, 2008, in an interlocutory appeal, this court affirmed the trial court and held that the Jewish clause in the Max Trust was contrary to public policy and, thus, unenforceable. *In re Estate of Feinberg*, 383 Ill. App. 3d 992 (2008). On September 24, 2009, our supreme court reversed the rulings of the appellate and trial courts, holding that Max's estate plan, when assessed in conjunction with Erla's directions for distribution under the 1997 appointment, did not violate public policy. *In re Estate of Feinberg*, 235 Ill. 2d 256 (2009). Specifically, the supreme court found the Jewish clause valid.

¶ 9 On May 22, 2007, while the interlocutory appeal was pending, Fifth Third Bank (the Bank), as the corporate trustee of the Feinberg Trusts, filed a petition for citation to recover assets (the recovery citation) against Michael and Leila, as coexecutors of Erla's estate, and against Marshall. The recovery citation sought to recover assets and property which belonged to the corpus of the Feinberg Trusts and which were allegedly misappropriated by Michael and the Taylors: funds withdrawn from Erla's various convenience bank accounts (count I); funds to maintain and improve Erla's condominiums (count II); funds taken from a Vanguard investment account (count III); and cash belonging to Erla in a safe deposit box (count IV). On August 28, 2009, the trial court granted Michele's motion for joinder to the Bank's recovery citation. After joining as a party to the recovery citation, Michele sought leave of court to amend the recovery citation to include the recovery of Erla's Florida condominium, funds taken from Erla's "gifting program," and a claim for punitive damages. The trial court denied Michele leave to amend the recovery citation to include a claim for punitive damages, but granted her leave to amend the

recovery citation to include Erla's Florida condominium and funds taken from Erla's "gifting program."

¶ 10    On remand from the supreme court's 2009 ruling, on February 8, 2010, the Taylors' son, Jon, as a beneficiary of the Feinberg Trusts, filed a motion for summary judgment on the recovery citation.   He argued that the 1997 appointment and the second amendment were invalid because they were drafted by his nonattorney father, Marshall.   On April 14, 2010, the trial court denied Jon's motion for summary judgment on the recovery citation.

¶ 11    Prior to trial on the recovery citation and Michele's tort action against Michael and the Taylors, the trial court determined that a fiduciary relationship existed as a matter of law between Michael, Leila and Erla as of June 29, 1994, when Erla signed a durable power of attorney naming both Michael and Leila as her agents.   From May 24, 2010 to June 3, 2010, a bench trial was held to resolve the complaint following resolution of the interlocutory appeal.   The court heard the testimony of the Taylors; Michael; Marcy; Michele; the Bank's expert witness, William Thullen (Thullen); Michele's expert witness, Scott Stringer (Stringer); the Bank's regional fiduciary executive, David Frye (Frye); and the Bank's portfolio manager, Walter Tizura (Tizura).   At trial, the trial court granted a motion for a directed finding in favor of the Taylors and Michael on Michele's claim of conspiracy to intentionally interfere with testamentary expectancy (count III).

¶ 12    On May 16, 2011, the trial court entered an order granting the recovery citation, filed by the Bank, which stated that the Taylors were deemed to hold $1,911,107 plus reasonable attorney fees and costs in "constructive trust" for the benefit of the Erla Trust, and that Michael was deemed to hold in "constructive trust" $788,957 plus reasonable attorney fees and costs for the benefit of the

Erla Trust. The trial court found that the Taylors and Michael, as fiduciaries to Erla, failed to rebut the presumption that the transactions by which they benefitted were the product of fraud or undue influence over Erla. However, the court found that Erla's annual gifting program was "wisely implemented to take advantage of the annual gift tax exclusions" and that Erla was aware of the program. The court further found that evidence at trial was insufficient to subject Erla's Florida condominium to recovery. The trial court then denied the Bank's request for prejudgment interest on the recovered assets. The trial court further found that, based on its findings with regard to the recovery citation, the remaining counts of Michele's tort action alleging intentional interference with testamentary expectancy need not proceed as they were duplicative of the remedy sought in the recovery citation filed by the Bank. The trial court then allowed Michele to file a separate petition for attorney fees.[3]

¶ 13 On June 14, 2011, Michele filed a petition for attorney fees. On June 28, 2011, the trial court denied the Taylors' motion to reconsider its May 16, 2011 order, and clarified that the May 16, 2011 ruling was final and appealable pursuant to Illinois Supreme Court Rule 304(b)(1) (eff. Jan. 1, 2006).

¶ 14 On July 27, 2011, the Taylors filed a notice of appeal, which appealed the trial court's May 16, 2011 order and June 28, 2011 ruling denying the Taylors' motion to reconsider (appeal No. 1-11-2258). On that same day, July 27, 2011, Michele filed a notice of appeal, which appealed

---

[3] Although our supreme court, in its September 24, 2009 ruling on interlocutory appeal in *In re Estate of Feinberg*, 235 Ill. 2d 256 (2009), held that the Jewish clause in the Max Trust was valid and did not violate public policy, Michele may nevertheless remain as a party on remand in the instant lawsuit because she is a descendant and distribute under the Erla Trust, which had eliminated the Jewish clause by virtue of the second amendment in 1997.

the trial court's May 16, 2011 order (appeal No. 1-11-2219).   On August 3, 2011, the Bank filed a notice of cross-appeal, which appealed the portion of the May 16, 2011 order that denied its request for prejudgment interest on the recovered assets.   Michael does not appeal the trial court's May 16, 2011 ruling which ordered him to return $788,957 to the Erla Trust.[4]

¶ 15    On August 19, 2011, the Bank filed a petition for instructions, seeking instructions from the trial court on how the assets of the Feinberg Trusts should be distributed.   The petition for instructions proposed that the trial court resolve certain issues, including whether the 1997 appointment and the second amendment to the Erla Trust were valid, before any trust assets would be distributed.   On November 30, 2011, the Taylors filed a response to the Bank's petition for instructions, arguing that the 1997 appointment and the second amendment to the Erla Trust were invalid.   On January 11, 2012, the trial court denied the petition for instructions, finding that the "time for contests regarding the validity of the testamentary documents has long since passed." The trial court found that our supreme court's 2009 ruling in this case was law of the case, and that the 1997 appointment and the second amendment were not the subject of contests before the supreme court and "they cannot be the subject of a contest now."   See *In re Estate of Feinberg*, 235 Ill. 2d 256.

¶ 16    On March 9, 2012, the trial court entered an order granting the Bank, as trustee of the Erla Trust, a total of $540,000 in attorney fees, to be imposed against Michael ($270,000) and the Taylors ($270,000) equally.   On March 26, 2012, the trial court entered an order, *nunc pro tunc* March 9, 2012, clarifying that the total amount of $540,000 in attorney fees awarded to the Bank as

---

[4] However, Michael does file a response brief before this court to address issues raised by other parties on appeal which pertain to him.

trustee of the Erla Trust shall be apportioned *severally* between Michael in the amount of $270,000 and the Taylors in the amount of $270,000. The order specifically stated that there was "no just reason to delay enforcement or appeal or both pursuant to Rule 304(a)." On May 17, 2012, the trial court entered an order awarding Michele $100,000 in attorney fees from the amounts recovered pursuant to the recovery citation.

¶ 17    On May 25, 2012, the Bank filed a petition to approve its proposed plan of distribution of the assets (distribution plan), which proposed that, pursuant to the 1997 appointment, the $250,000 share to each of the four grandchildren (Michele, Aron, Aimee and Lisa) who are deemed deceased under the Max Trust, for a total of $1 million, be split equally between Michael ($500,000) and Leila ($500,000). The distribution plan also proposed that, pursuant to the second amendment to the Erla Trust, $100,000 be distributed to each of the five grandchildren (Michele, Aron, Jon, Aimee and Lisa). The distribution plan proposed that, per the terms of the Erla Trust, any remaining assets in the Erla Trust would be split into individual trusts for the beneficiaries as follows: Michael Trust 25%; Leila Trust 25%; Michele Trust 12.5%; Aron Trust 12.5%; Jon Trust 8.33%; Aimee Trust 8.33%; and Lisa Trust 8.33%. The distribution plan also recommended that the funds held in trust for Michael and Leila be distributed to them outright. It further proposed that funds distributed to Michael as a beneficiary of the Feinberg Trusts be credited against his $788,957 judgment in this case until it is paid in full. On August 10, 2012, the trial court approved the distribution plan and ordered the Bank to distribute the funds from the Feinberg Trusts accordingly. The trial court further ordered the Bank to retain sufficient funds in the Feinberg Trusts to cover Leila's and Michael's petitions for fees as coexecutors of Max's and Erla's

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

estates. The August 10, 2012 order included Rule 304(a) language that there was "no just reason to delay enforcement, appeal or both."

¶ 18    On August 20, 2012, Michele filed a notice of appeal, which appealed the trial court's August 10, 2012 order (appeal No. 1-12-2476). On September 6, 2012, Leila, individually and as coexecutor of Erla's estate, filed a notice of appeal to the trial court's August 10, 2012 order (appeal No. 1-12-2715). On October 17, 2012, this court consolidated the four appeals (appeal Nos. 1-11-2219; 1-11-2258; 1-12-2476; and 1-12-2715).

¶ 19    On October 30, 2012, upon petition for fees filed by Leila and Michael as coexecutors of Max's and Erla's estates, the trial court ordered the Bank to pay Michael $92,237.12 in fees from the Erla Trust for work performed as coexecutor of Max's and Erla's estates. On December 19, 2012, the trial court ordered the Bank to pay Leila $48,890.07 in fees from the Erla Trust and $16,581.18 from the Max Trust for work performed as coexecutor of Max's and Erla's estates.

¶ 20                                              ANALYSIS

¶ 21    This consolidated appeal by the Taylors and Michele, as well as a cross-appeal filed by the Bank, stem from the trial court's May 16, 2011 order. The appeal by the Taylors and Michele also challenges the trial court's August 10, 2012 order. This court has proper jurisdiction over this consolidated appeal and cross-appeal pursuant to Supreme Court Rule 304(b)(1) (eff. Jan. 1, 2006), which pertains to final judgments and orders "entered in the administration of an estate, guardianship, or similar proceeding which finally determines a right or status of a party." For ease of understanding, we address each party's arguments in turn. The facts and arguments are many.

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

¶ 22    On appeal, the Taylors argue that: (1) Michele lacks standing and is not a proper beneficiary to the Erla Trust; (2) the distribution plan was invalid because it was based on a void trust agreement; (3) evidence at trial did not establish that Marshall's fiduciary relationship with Erla began in 1986; (4) funds taken from the Vanguard account should not have been returned to the Erla Trust; (5) the trial court erred in failing to apply a "missing evidence" presumption against Michael; and (6) the trial court erred in finding that the Taylors misappropriated $18,770 from a Morgan Stanley account.

¶ 23    As an initial matter, we address the Taylors' argument that Michele lacks standing to pursue a claim as well as this appeal and is not a proper beneficiary to the Erla Trust.   The basis for their argument is that the second amendment to the Erla Trust, which deleted the Jewish clause, was void as contrary to public policy because it was drafted by a nonlawyer, namely, Marshall. The thrust of the Taylors' argument is that, if the second amendment was void, the Jewish clause in the Erla Trust would again become effective, thus deeming Michele deceased under the Erla Trust and barring her claims against the Taylors in their entirety.   The Taylors point to section 2BB of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/2BB (West 2008)), which provides that a nonlawyer who drafts a trust document is guilty of a Class A misdemeanor.   The Taylors also argue that the 1997 appointment, which was also drafted by Marshall, was void for the same reason.

¶ 24    We find that the Taylors' challenge to the validity of the second amendment and the 1997 appointment is essentially a trust contest.   Section 8-1(f) of the Probate Act of 1975 (Probate Act) states that "[a]n action to set aside or contest the validity of a revocable inter vivos trust agreement

or declaration of trust to which a legacy is provided by the settlor's will which is admitted to probate shall be commenced within and not after the time to contest the validity of a will as provided in section (a) of this [s]ection and [s]ection 13-223 of the Code of Civil Procedure." 755 ILCS 5/8-1(f) (West 2008). Section 8-1(a) of the Probate Act provides that an action to contest the validity of a will must be filed within six months after the admission of the will to probate. 755 ILCS 5/8-1(a) (West 2008); 735 ILCS 5/13-223 (West 2008) (an action to contest the validity of a trust agreement shall commence within the time to contest the validity of a will under the Probate Act). The six-month limitation period is a jurisdictional limitation barring any claim to contest the validity of a will or trust filed beyond that period. *In re Estate of Luccio*, 2012 IL App (1st) 121153, ¶ 20. On September 8, 2004, Erla's will was admitted to probate (case No. 04 P 5093) and Max's will was admitted to probate on January 24, 2005 (case No. 05 P 0173). Thus, any action contesting the validity of the second amendment or the 1997 appointment was required to have been filed within six months–by March 8, 2005 or July 24, 2005, at the latest. However, no party contested these trust instruments within the appropriate time period. As the trial court correctly noted in its April 10, 2010 ruling denying Jon's motion for summary judgment on the recovery citation and the court's January 11, 2012 order denying the Bank's petition for instructions, this was a "trust contest that is about five years too late." The court also noted that the "time for contests regarding the testamentary documents has long since passed." Accordingly, the Taylors' challenges to the validity of the second amendment and the 1997 appointment are untimely.

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

¶ 25     Nonetheless, the Taylors argue that they do not *contest* the trust instruments but, rather, request this court to *construe* the second amendment as void against public policy because it was drafted by Marshall, a nonlawyer, in violation of section 2BB of the Consumer Fraud Act.   See 815 ILCS 505/2BB (West 2008).   For support, they cite *Landheer v. Landheer*, 383 Ill. App. 3d 317 (2008), and *Herlehy v. Mary V. Bistersky Trust*, 407 Ill. App. 3d 878 (2010).

¶ 26     Our supreme court has held that the General Assembly did not intend the Consumer Fraud Act to apply to conduct which takes place outside of Illinois.   See *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 185 (2005).   At trial, Marshall testified that, after consulting an attorney, Marshall drafted both the second amendment and the 1997 appointment in California and that Erla signed these documents while visiting the Taylors' home in California. None of the circumstances surrounding the drafting or signing of the documents occurred in Illinois and, thus, the Consumer Fraud Act does not apply in this case.   We further find the Taylors' cited cases, *Landheer* and *Herlehy*, to be factually distinguishable, where the conduct which gave rise to the holdings in those cases took place in Illinois and, thus, triggered the applicability of the Consumer Fraud Act.

¶ 27     Moreover, we find that the law-of-the-case doctrine bars the Taylors' challenge to the validity of the 1997 appointment.   Generally, the law-of-the-case doctrine prohibits reconsideration of issues which have been decided in a prior appeal.   *In re Christopher K.*, 217 Ill. 2d 348, 365 (2005).   "The rule is that no question which was raised or could have been raised in a prior appeal on the merits can be urged on subsequent appeal and those not raised are considered waived."   (Internal quotation marks omitted.)   *Preferred Personnel Services, Inc. v. Meltzer,*

- 13 -

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

*Purtill & Stelle, LLC*, 387 Ill. App. 3d 933, 947 (2009). Where there are no material changes in the facts since the prior appeal, such issues may not be relitigated in the trial court or reexamined in a second appeal. *In re Christopher K.*, 217 Ill. 2d at 365. The purpose behind the law-of-the-case doctrine is to "protect [] settled expectations of the parties, ensure [] uniformity of decisions, maintain [] consistency during the course of a single case, effectuate [] proper administration of justice, and bring [] litigation to an end." *Long v. Elborno*, 397 Ill. App. 3d 982, 989 (2010). Here, our supreme court's previous ruling in this case explicitly relied upon the existence and validity of the 1997 appointment in reaching its decision regarding the terms of the Max Trust. See *In re Estate of Feinberg*, 235 Ill. 2d at 281. At no time did the Taylors or any other party assert while the case was under consideration in our supreme court, that the 1997 appointment was void. Specifically, there were no material changes in the facts of this case since the prior appeal. To reconsider the validity of the 1997 appointment at this juncture in the litigation *after* our supreme court had previously relied upon its validity would violate the settled expectations of the parties, undermine consistency in this case, and create an erroneous example for other cases. Therefore, we hold that Michele has standing to pursue her claims as a proper beneficiary of the Erla Trust.

¶ 28 Turning to the merits of the case, we examine the Taylors' challenge to the distribution plan, which was proposed by the Bank and approved by the trial court on August 10, 2012. To the extent that the Taylors argue that the distribution plan was invalid because it was based on the invalidity of the second amendment and the 1997 appointment, this argument is defeated based on our holding rejecting the Taylors' challenges to the validity of these trust instruments. Likewise,

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

we reject the Taylors' assertion that allowing the second amendment and the 1997 appointment to stand would be inconsistent with the trial court's May 16, 2011 order finding another document prepared by Marshall–a "gift document"–to be invalid. The "gift document" was not a trust instrument, but instead was a document drafted by Marshall and signed by Erla which purportedly gifted Leila with the funds of Erla's investment account.

¶ 29    In the alternative, the Taylors, without citing any legal authority, challenge the distribution plan on the basis that it did not strictly follow all of the terms of the 1997 appointment. The 1997 appointment specified that, upon Erla's death, Michael and Leila and any grandchildren who were not deemed deceased under the Max Trust shall receive $250,000, and that the $250,000 share of each grandchild who was deemed deceased under the Max Trust "shall be paid equally to the *parents* of that grandchild." (Emphasis added.) The distribution plan called for the $250,000 share of each "deceased" grandchild to be split equally between Michael and Leila. According to the Taylors, Marshall (father of Lisa and Aimee) and Marion (mother of Michele and Aron), who are *parents* of a "deceased" grandchild, should also each receive $250,000. Further, the Taylors argue in the alternative, without citing any legal authority and without any citation to the record, that the "5X5 language" in the Max Trust was not strictly followed in the distribution plan. We find these alternative arguments to be forfeited. See *In re Marriage of Wassom*, 352 Ill. App. 3d 327, 332-33 (2004) (failure to cite legal authority in a party's brief forfeits the issue for review); Ill. S. Ct. R. 341(h)(7) (eff. Sept. 1, 2006) (failure to cite to pages to the record relied upon in support of the contentions in a party's brief forfeits the arguments for review). Forfeiture aside, paragraph 3.3(c) of the Max Trust empowered Erla to distribute the principal of the Max Trust to his

- 15 -

"descendants." We find that Marshall and Marion were not descendants of Max[5] and thus were ineligible to take under the 1997 appointment. Thus, the trial court did not err in approving the Bank's distribution plan to allow only Michael and Leila, as both descendants of Max and parents to Max's "deceased" grandchildren, to receive equal shares of the "deceased" grandchildren's inheritance.

¶ 30     We next determine whether the trial court erred in finding that Marshall's fiduciary relationship with Erla began in 1986, which we review under a manifest weight of the evidence standard. See *Kurtz v. Solomon*, 275 Ill. App. 3d 643, 645 (1995). A trial court's finding is not against the manifest weight of the evidence unless an opposite conclusion is clearly evident. *In re Estate of Wilson*, 238 Ill. 2d 519, 570 (2010). If the record contains any evidence to support the trial court's judgment, the judgment should be affirmed. *Id.*

¶ 31     The Bank's recovery citation alleged that a fiduciary relationship existed between Erla and each defendant, Marshall, Leila and Michael; consequently, transactions that occurred after the formation of the fiduciary relationships in which the defendants benefitted were presumed to be fraudulent. Prior to trial, the trial court determined that a fiduciary relationship existed as a matter of law between Erla and Michael and Erla and Leila, as a result of a 1994 durable power of attorney (1994 POA) which Erla signed naming them as her agents. At trial, Michael admitted that his fiduciary relationship with his mother, Erla, had existed since the death of his father, Max. Based on this evidence, the trial court found that Michael's fiduciary relationship with Erla had

---

[5] The terms of the Max Trust provided that, upon Erla's death, the assets in the Max Trust would be distributed amongst their children and grandchildren. Because Marshall and Marion were only the spouses of the adult children of Erla and Max, they were not "descendants" under the Max Trust.

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

existed since the date of Max's death on December 4, 1986. As for Marshall, the trial court found that because he was not named as an agent under Erla's 1994 POA, a fiduciary relationship did not exist between Erla and Marshall as a matter of law. Instead, the trial court looked to relevant factors–such as Erla's complete trust and confidence in Marshall's handling of her financial matters, the disparity in their ages, their kinship, and his drafting of various documents on behalf of Erla–in finding that Marshall's fiduciary relationship with Erla began when Max died in 1986 until Erla's death in 2003.

¶ 32    When no fiduciary relationship exists as a matter of law, the party seeking relief must show by clear and convincing evidence the existence of such relationship. *In re Estate of Martino*, 99 Ill. App. 3d 907, 910 (1981); see *Simon v. Wilson*, 291 Ill. App. 3d 495, 503 (1997) (where no fiduciary relationship exists as a matter of law, plaintiff must show that "one party placed trust and confidence in the other so that the latter gained influence and superiority over the former"). Relevant factors in determining whether a fiduciary relationship exists include: "the degree of kinship between the parties; the disparity in age, health, mental condition and education and business experience between the parties; and the extent to which the 'servient' party entrusted the handling of [his] business affairs to the 'dominant' party and placed trust and confidence in the 'dominant' party." *In re Estate of Bontkowski*, 337 Ill. App. 3d 72, 78 (2003) (citing *Gonzalzles v. American Express Credit Corp.*, 315 Ill. App. 3d 199, 210 (2000)). Once a fiduciary relationship is shown to exist, the presumption is that a transaction between the dominant and servient parties which profits the dominant party is fraudulent. *Lemp v. Hauptmann*, 170 Ill. App. 3d 753, 757 (1988). "The dominant party then has the burden of proving by clear and convincing evidence

- 17 -

that the transaction was fair and equitable, and did not result from his undue influence over the servient party." *Id.*

¶ 33    The Taylors do not deny that Marshall had a fiduciary relationship with Erla in 1994, when Marshall drafted the 1994 POA on behalf of Erla.   However, they contest the trial court's finding that Marshall became a fiduciary to Erla dating back to Max's death in 1986, and argue that he owed no fiduciary duty to Erla between 1986 and 1994.   Michele and the Bank argue that evidence at trial sufficiently showed that Marshall's fiduciary relationship with Erla started in 1986.

¶ 34    At trial, evidence was presented that Marshall was about 25 years younger than Erla and was married to her daughter, Leila.   Marshall had a medical degree and later became a registered investment advisor with the Securities and Exchange Commission (SEC) and the State of California.   Erla's education was limited to one year of college.   Marshall testified that he had been advising Erla regarding financial matters since 1986; that he had helped Erla with her taxes since 1986; that, within a month after Max died, Marshall and Erla contacted the Bank to arrange for all correspondences and monthly statements concerning investments in the Feinberg Trusts to be sent solely to Marshall; that Erla relied on Marshall to help her navigate matters related to the Feinberg Trusts; that, "in the wake of Max's death," he familiarized himself with Erla's various bank accounts and participated in converting Erla's accounts into joint tenancies with Leila and Michael; and that both Max and Erla trusted him to look after the family's financial affairs.   Trial exhibits showed that on August 2, 1996, Marshall wrote a letter to the family in which he explained that, between 1986 and 1996, "[i]t fell on me to oversee the Feinberg investment and

give guidance to [Erla] regarding decisions that needed to be made with regard to the Feinberg Trusts." A 1986 letter, which was written by Marshall to Erla two weeks after Max died, included an explanation to Erla regarding "the mechanics of [the Max Trust] and the money coming to [Erla]." Further, trial evidence showed that Marshall drafted various documents for Erla after Max's death, including the 1994 POA, the 1997 appointment, the second amendment, "gift letters," and real estate documents.

¶ 35    We find that the evidence at trial supported the trial court's ruling that Marshall's fiduciary relationship with Erla began in 1986 after Max died. We find that Michele and the Bank presented clear and convincing evidence that Erla placed trust and confidence in Marshall to handle the family's financial affairs so as to allow Marshall to gain influence and superiority over Erla. Evidence regarding Marshall's formal education, the age disparity between him and Erla, the fact that Erla entrusted management of her assets to Marshall, and Marshall's position as Erla's son-in-law, weighed in favor of finding that Marshall became Erla's fiduciary in 1986.

¶ 36    The Taylors, however, citing *In re Estate of Rothenberg*, 176 Ill. App. 3d 176 (1988), argue that the trial court's finding was against the manifest weight of the evidence. They point to evidence in the record–such as the fact that Marshall was not a trustee of the Erla Trust and that Marshall lived in California while Michael and Marcy took care of Erla's daily needs in Chicago–to suggest that an opposite conclusion was apparent. We disagree.

¶ 37    In *In re Estate of Rothenberg*, a dispute arose between two sisters over the disposition of property made by their mother prior to her death. *Id.* at 178. The mother had executed a land trust agreement which named her daughters as beneficiaries, but amended it two days later to

exclude one of the daughters. *Id.* at 179-80. In estate proceedings, the disinherited daughter alleged that her sister owed their mother a fiduciary duty, that the mother's mental condition was such that she could not manage her own affairs and looked to the sister to do so, and that the sister breached her fiduciary duties to the mother. *Id.* at 181. The trial court heard evidence that favored both the disinherited daughter and her sister. *Id.* at 181-82. In finding that the evidence did not show that a fiduciary relationship existed between the mother and the sister, the trial court specifically referred to the testimony of two attorney witnesses who stated that the mother had the legal capacity, sound mind and sufficient memory to make legal decisions. *Id.* at 182. On appeal, the reviewing court declined to substitute its judgment for that of the trial court and found that the trial court's ruling was not against the manifest weight of the evidence. *Id.* at 184.

¶ 38     Like the *Rothenberg* court, we decline to substitute our judgment for that of the trial court. The trial court is in a superior position to hear and weigh the evidence and determine the credibility of the witnesses. *In re Estate of Teall*, 329 Ill. App. 3d 83, 91 (2002). We find that the evidence presented at trial supported the trial court's finding that Marshall's fiduciary relationship with Erla began in 1986. Nor do we accept the Taylors' argument that Marshall owed no fiduciary duty to Erla beginning in 1986 on the basis that the status of a "financial advisor" or "financial planner" did not create a fiduciary relationship. We find the cases cited by the Taylors in support of this contention to be misplaced. See *Joyce v. Morgan Stanley & Co.*, 538 F.3d 797 (7th Cir. 2008); *Quintas v. Asset Management Group, Inc.*, 395 Ill. App. 3d 324 (2009); *Congregation of the Passion, Holy Cross v. Touche Ross & Co.*, 224 Ill. App. 3d 559 (1991). Therefore, we hold that the trial court's finding was not against the manifest weight of the evidence.

¶ 39    Next, we determine whether the trial court erred in finding that the $1,630,000 which was misappropriated by Leila from Erla's Vanguard account should be returned to the Erla Trust.

¶ 40    In 1993, the Vanguard investment account, in which Erla, Leila and Michael held joint interests, was established.  The Vanguard account was opened with funds from various bank accounts (the "seed" accounts).   The seed accounts consisted solely of funds which were owned by Erla.   Neither Leila nor Michael contributed any funds that were deposited into the seed accounts or the Vanguard account.   All of the seed accounts, except the one held by Old Kent Bank, were held in joint tenancy by Erla, Leila and Michael.   The Taylors received bank statements and maintained a checkbook for the Vanguard account at their home in California.   It is undisputed that in 2002, over the course of four separate transactions, Leila transferred a total of $1,630,000 from the Vanguard account into her own personal bank account.   In the May 16, 2011 order, the trial court found that the establishment of the Vanguard account in 1993 at Marshall's direction and Leila's deposit of the $1,630,000 into her own bank account in 2002, were presumed to be fraudulent.   The trial court ordered those funds to be returned to the Erla Trust.

¶ 41    The Taylors do not challenge the trial court's findings that the establishment of the Vanguard account and the transfer of the $1,630,000 to Leila's personal bank account were fraudulent.   Instead, they argue, citing *Simon*, 291 Ill. App. 3d 495, that the parties' joint tenancy in the Vanguard account should have been deemed "severed" and should have been converted into a tenancy-in-common account held by Erla's estate, Michael and Leila.   In the alternative, they contend that the misappropriated funds should be returned to the seed accounts or the Max Trust,

rather than the Erla Trust. Michele and the Bank counter that the misappropriated funds from the Vanguard account should be returned to the Erla Trust.

¶ 42 We find that the trial court did not err in ordering the misappropriated funds to be returned to the Erla Trust. In *Simon*, a case upon which the Taylors rely, a couple was married for 40 years until the wife, Ruth, died. *Id.* at 500. During their marriage, the couple jointly owned sizeable personal and real property. *Id.* Ruth's will provided for the transfer of property to her daughter and grandchildren upon her death. *Id.* at 501. While Ruth was ill, her husband, Sam, transferred all of the couple's jointly held securities, worth approximately $1.34 million, into a trust he controlled. *Id.* at 502. After Ruth's death, Ruth's daughter and grandchildren sued Sam, alleging that he benefitted from the transfer of the securities into his trust, that he destroyed Ruth's survivorship rights to the securities, and that he frustrated Ruth's desire to pass her property to them, and they sought to establish Ruth's interest in the property held in the trust. *Id.* at 502. The trial court granted Sam's motion to dismiss the claims. *Id.* at 503. On appeal, the reviewing court found that Sam owed Ruth a fiduciary duty, that his unilateral transfer of the joint tenancy property into his trust "effectively severed the joint tenancy," and the transfer was presumptively fraudulent. *Id.* at 504. The reviewing court stated that, on remand, Sam would be given an opportunity to rebut this presumption with clear and convincing evidence. *Id.* at 504-05. If Sam is unable to overcome the presumption of fraud, then, following the severance of a joint tenancy, "the former joint tenants hold the property as tenants in common, each with an undivided one-half interest." *Id.* at 505.

- 22 -

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

¶ 43    We find *Simon* to be factually distinguishable to the case at bar. Here, unlike *Simon*, where the legitimacy of the creation of Sam's joint tenancy in the property he shared with Ruth was not in dispute, the Taylors never had any legitimate ownership rights in the Vanguard account. Indeed, the trial court found that the creation of the Vanguard account was presumptively fraudulent because it was established *after* the Taylors and Michael had become Erla's fiduciaries and they failed to rebut the presumption of fraud. Thus, there is no legal basis to support the Taylors' argument that the funds in the Vanguard account should be held by Leila, Michael and Erla's estate as tenants in common so as to allow Leila a one-third interest in the Vanguard account funds.

¶ 44    Nor do we find persuasive the Taylors' arguments in the alternative that the funds misappropriated from the Vanguard account should be returned to the seed accounts or the Max Trust. The Taylors fail to offer any legal support as to the propriety of this course of action, where the seed accounts were funded entirely with Erla's own money but were converted into joint tenancy accounts during the time the Taylors and Michael owed Erla a fiduciary duty, and where the Max Trust does not contain any provision that would allow or require assets from Erla's personal bank accounts to be deposited into the Max Trust. See *In re Marriage of Wassom*, 352 Ill. App. 3d at 332-33 (failure to cite legal authority in a party's brief forfeits the issue for review). Thus, we reject the Taylors' arguments on this issue and hold that the trial court properly ordered the return of the misappropriated funds to the Erla Trust.

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

¶ 45 Next, we determine whether the trial court erred in failing to apply a "missing evidence" presumption against Michael for his alleged misappropriation of funds from Erla's bank accounts between 1987 and November 1997.

¶ 46 The Bank's recovery citation alleged that Michael misappropriated funds from Erla's various bank accounts between 1998 and 2004, and that the funds rightfully belonged to the Erla Trust for distribution to the beneficiaries of the Erla Trust. The various bank accounts were joint accounts held by Erla, Leila and Michael at Bank One, Bank of Lincolnwood (BOL) and Bank of Wachovia (Wachovia). However, neither Michael nor Leila contributed any money to the accounts over the years, but instead, the funds belonged to Erla. After Max's death, Michael exerted complete control over the accounts and the account statements were sent directly to him, not Erla. Bank statements dating back to November 1997 showed, and the parties stipulated, that Michael made weekly cash withdrawals of $300 from Erla's BOL account and weekly cash withdrawals of $500 from the Bank One account. The trial court found, based on trial stipulations and the evidence presented, that Michael withdrew a total of $261,000 from the BOL account, a total of $264,000 from the Bank One account, and a total of $39,000 from the Wachovia account. Although Michael testified at trial that Erla had given him permission to withdraw money from her accounts at will and that some of the withdrawn funds were spent for Erla's benefit, the trial court found no credible corroborating evidence to support Michael's claim that he had permission from Erla to take these funds and found that any such funds spent on Erla's behalf was "de minimis." The trial court further found that the evidence established that Erla was completely unaware of these transactions, that there was no adequate consideration paid to her at any time, and that Erla

- 24 -

never had independent legal or financial advice from any source other than Michael and Marshall regarding her assets.

¶ 47    The Taylors argue that, because Michael failed to produce bank statements prior to 1997, the trial court should have applied a "missing evidence" presumption against Michael for any withdrawals he made between 1987 and November 1997, so as to allow the recovery of additional funds to the Erla Trust.

¶ 48    Michael and Michele counter that the Taylors lacked standing to pursue this claim, arguing that the Taylors did not "prosecute" any claims against Michael.   Michele specifically contends that neither she nor the Bank, as the parties suing Michael, requested that the trial court apply a "missing evidence" presumption, and thus, the court did not err in not applying such a presumption.   Michael and Michele further argue that, even if the Taylors had standing to pursue this issue, the issue was not properly before the trial court and is forfeited for review on appeal. The Bank takes no position with respect to this argument.

¶ 49    We find that Leila, as a beneficiary of the Erla Trust with direct interest in any additional funds that may be recovered from Michael, has standing to pursue this claim.   See *In re Estate of Strong*, 194 Ill. App. 3d 219, 225 (1990) (decedent's nephew has standing to appeal the circuit court's order in proceedings of which he was not a party, where he had "direct, immediate and substantial interest in the subject matter, which would be prejudiced by the judgment or benefitted by its reversal").   However, we find that, as Michele and Michael point out, the Taylors have forfeited review of this argument, where it was not properly presented to the trial court.   The record shows that on June 22, 2010, 19 days *after* trial ended, the Taylors filed a posttrial

"proposed findings of fact and conclusions of law" (the Taylors' proposed findings) before the trial court. The Taylors' proposed findings included a section entitled, "potentially applicable presumptions," which made no mention of any applicability of the "missing evidence" presumption. Although another section of the Taylors' proposed findings urged the court to "infer" that Michael had withdrawn money from Erla's bank accounts between 1987 and November 1997, we find that this and similar vague statements did not properly present the issue before this court. Further, the Taylors do not cite to the record to show that they raised this issue during trial. See *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 31 (failure to raise an issue before the trial court forfeits that issue for review on appeal). Even if not forfeited, we find that the trial court did not abuse its discretion in declining to apply the "missing evidence" presumption, where neither Michele nor the Bank, as the parties seeking to recover assets belonging to the Erla Trust pursuant to the recovery citation, requested the trial court to apply such a presumption. See generally *Tuttle v. Fruehauf Division of Fruehauf Corp.*, 122 Ill. App. 3d 835, 843 (1984) (court did not abuse its discretion in not giving jury a specific instruction allowing jury to draw adverse inference from a party's failure to produce evidence solely within that party's control). Therefore, we hold that the trial court did not err in declining to apply a "missing evidence" presumption against Michael at trial for his alleged misappropriation of funds from Erla's bank accounts between 1987 and November 1997.

¶ 50    We next determine whether the trial court erred in finding that the Taylors misappropriated $18,770 from a Morgan Stanley account that belonged to Erla.

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

¶ 51    In the May 16, 2011 order, the trial court found that the Taylors and Michael fraudulently took possession of Erla's investment accounts at TD Waterhouse, Morgan Stanley Annuities, Morgan Stanley, and Mesirow Financial.  The trial court found that all of these investment accounts were titled as "joint tenancy accounts" after Erla signed a durable power of attorney naming Michael and Leila as her agents in June 1994.  The trial court found that Michael took a total of $23,333 from the Morgan Stanley Annuities account; $56,651 from the Morgan Stanley account; and $18,811 from the Mesirow Financial account.  The trial court further found that the Taylors took a total of $94,081 from the TD Waterhouse account; $23,333 from the Morgan Stanley Annuities account; $18,811 from the Mesirow Financial account; and $18,770 from the Morgan Stanley account.[6]

¶ 52    The Taylors argue that the trial court's erroneous ruling that they had taken $18,770 from Erla's Morgan Stanley account was not supported by the evidence; thus, they should not be liable for this amount.

¶ 53    The Bank acknowledges that the trial court mistakenly attributed the origins of the $18,770 to the Morgan Stanley account, but argues that it had originated in the Mesirow Financial account. The Bank explains that the trial court's mistake can be traced to a report created by its trial expert, Thullen, who mistakenly stated that the $18,770 derived from the Morgan Stanley account instead of the Mesirow Financial account.  The Bank, however, argues that the trial court's mistaken reference to the Morgan Stanley account rather than the Mesirow Financial account did not change the fact that the Taylors took $18,770 from Erla which did not belong to them.  In reply, the

_____

[6] The Morgan Stanley Annuities account is separate from the Morgan Stanley account.

- 27 -

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

Taylors assert that the evidence did not support the Bank's explanation. Michele and Michael's response briefs are silent on this issue.

¶ 54 The parties' trial stipulations showed that, after Erla died, Leila received $23,333 from the Morgan Stanley Annuities account and $18,811 from the Mesirow Financial account. The record shows that a report created by the Bank's trial expert witness in forensic accounting, Thullen, stated that Leila received $18,770 from the Morgan Stanley account in November 2003. At trial, Thullen clarified that the $18,770 sum was actually withdrawn from the Mesirow Financial account, not the Morgan Stanley account, and was made payable to Leila in November 2003. Based on our thorough review of the records, we find that the evidence supports only one disbursement of funds to the Taylors from the Mesirow Financial account in November 2003. That amount was stipulated by the parties to be $18,811, for which the trial court found the Taylors to be liable. The Bank's arguments before this court suggest that there were *two* improper distributions made to the Taylors from the Mesirow Financial account–one for $18,811, and another for $18,770. However, we can find no support for this in the record and conclude that there is no support in the record for a finding that the Taylors received two disbursements from the Mesirow Financial account in November 2003 or at any other time. Thus, we find that only the amount stipulated by the parties to have been improperly taken by the Taylors from the Mesirow Financial account–$18,811–will stand. Accordingly, we reverse the trial court's ruling that the Taylors improperly took an additional $18,770 from the Morgan Stanley (or Mesirow Financial) account.

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

¶ 55   We now turn to Michele's arguments on appeal.   On appeal, Michele argues that: (1) the trial court abused its discretion in declining to award punitive damages; (2) the trial court erred in ruling that funds disbursed by Erla's "gifting program" were not subject to recovery; (3) the trial court erred in declining to impose constructive trusts against Michael and the Taylors; (4) the trial court erred in finding that evidence at trial was insufficient to subject Erla's Florida condominium to recovery; (5) the trial court erred in finding that the remaining counts of Michele's tort action alleging intentional interference with testamentary expectancy need not proceed as they were duplicative of the remedy sought in the recovery citation; (6) the distribution plan contradicted the express terms of the Feinberg Trusts; and (7) she was entitled to more than $100,000 in reasonable attorney fees.

¶ 56   We first determine whether the trial court abused its discretion in declining to award punitive damages to Michele.   See *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1137-38 (2004) (for a bench trial, whether punitive damages should be awarded is reviewed under an abuse of discretion standard; the trial court's finding that defendant's conduct was not willful or malicious is reviewed under a manifest-weight standard).

¶ 57   In its May 16, 2011 order, the trial court found that the evidence presented at trial was insufficient to rebut the presumption of undue influence against the Taylors and Michael during the relevant times they owed a fiduciary duty to Erla.   The trial court, however, found that neither the Taylors nor Michael willfully or maliciously exercised undue influence over Erla.   The trial court specifically noted that they "acted purely out of greed for themselves and their respective children," but that there was no evidence that they ever acted to the detriment of Erla nor was there

- 29 -

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

ever any malicious action directed toward her. The trial court stated that Erla was well cared for, that her bills were always paid, and that Erla possessed sufficient funds to maintain her standard of living and care at all times.

¶ 58     Michele argues that the trial court's refusal to impose punitive damages against the Taylors and Michael was erroneous, where they breached their fiduciary duties to Erla and acted with wanton disregard of the beneficiaries by misappropriating a substantial amount of money from Erla. She contends that the trial court ignored uncontroverted evidence that the Taylors and Michael committed "multiple serious felony crimes," which warranted the imposition of punitive damages against them. Further, Michele proffers that imposing punitive damages against them is the only way to deter similar conduct in the future.

¶ 59     The Taylors counter that Michele has forfeited review of this issue on appeal because it was only raised in her lawsuit against the Taylors and Michael, but was not sought in the recovery citation. They contend that, regardless of forfeiture, the trial court's findings that neither the Taylors nor Michael acted willfully or maliciously against Erla were not against the manifest weight of the evidence, and the trial court's ultimate decision to deny punitive damages was not an abuse of discretion.

¶ 60     Michael argues that the trial court did not abuse is discretion in declining to impose punitive damages against him. He contends that the trial court was in the best position to assess the character of his conduct, and that it was undisputed he devoted an enormous amount of time to Erla's care during the last 15 years of her life. Michael further argues that the trial court's decision not to impose punitive damages was proper, where it had already assessed $270,000 of attorney

- 30 -

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

fees against him in favor of the Bank. He asserts that Michele had not pointed to any aggravating circumstances that would allow her to collect punitive damages.

¶ 61    The purposes of punitive damages are to punish a specific defendant and to deter similar conduct in the future. *Franz*, 352 Ill. App. 3d at 1137. Such damages will be awarded "only where the defendant's conduct is willful or outrageous due to evil motive or a reckless indifference to the rights of others." *Id.* "Because punitive damages are not favored in the law [citation], they are available only in cases where the wrongful act complained of is characterized by wantonness, malice, oppression, willfulness, or other circumstances of aggravation [citation]." *Id.*

¶ 62    We first address the Taylors' argument that Michele had forfeited her claim for punitive damages on appeal. The record shows that after Michele joined as a party to the recovery citation in August 2009, she sought leave of court to amend the recovery citation to include the recovery of the following: Erla's Florida condominium; funds taken from Erla's "gifting program"; and a claim for punitive damages. The trial court only granted Michele leave to amend the recovery citation to include Erla's Florida condominium and the "gifting program" funds, but denied her leave to amend as to the claim for punitive damages. However, a request for punitive damages was contained in Michele's separate lawsuit alleging misappropriation of funds against the Taylors and Michael. As noted, claims in both the recovery citation and Michele's lawsuit were heard by the court at the 2010 bench trial. While Michele did not specifically challenge on appeal the trial court's denial to include a claim for punitive damages in the recovery citation, her appeal of the trial court's May 16, 2011 final judgment drew into question all interlocutory orders that produced the final order. See *Pace Bus Co. v. Industrial Comm'n*, 337 Ill. App. 3d 1066, 1069 (2003).

- 31 -

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

Further, because a request for punitive damages was made in Michele's lawsuit against the Taylors and Michael, which was properly before the trial court in the bench trial, we find this issue to be properly before us on appeal.

¶ 63    However, we find that the trial court's decision to deny punitive damages was not erroneous.   Michele claims that the trial court acted inconsistently in finding that the Taylors and Michael failed to rebut the presumption of undue influence by clear and convincing evidence, while also finding that they did not act willfully or maliciously toward Erla.   We reject this contention.   While the Taylors and Michael failed to rebut the presumption of undue influence by clear and convincing evidence, the record does not show that any of their conduct was borne of an evil motive or a complete reckless disregard for others.   Rather, the evidence supports the trial court's findings that the parties "acted purely out of greed for themselves and their respective children," but that there was no evidence whatsoever of any malicious actions toward Erla. Michele also makes various arguments that the Taylors and Michael committed "multiple serious felony crimes," which warranted the imposition of punitive damages, by pointing to Marshall's drafting of legal documents in violation of the Consumer Fraud Act, Michael's alleged forgery of Max's dividend checks after Max died, and the Taylors and Michael's alleged exploitation of an elderly person under state statutes.   We decline to make any findings as to whether the parties' actions amounted to criminal conduct, where such criminal issues were not before the trial court and there was no evidence that the parties were even charged with any crimes.   Thus, we reject Michele's claim for punitive damages on this basis.   Nor do we find persuasive Michele's arguments that the Taylors' financial status as high net-worth individuals should be considered in

determining whether they would be sufficiently deterred from committing similar conduct in the future. We find that the Taylors' financial status bears no relevance to the trial court's findings that there was no evidence that the parties acted maliciously toward Erla. Further, Michele speculates that neither the Taylors nor Michael has been deterred from committing similar conduct in the future. While we do not condone the Taylors' and Michael's conduct at issue, we decline to engage in speculation as to whether they were sufficiently deterred from committing similar actions in the future where the trial court was in the best position to evaluate the parties' conduct in this case. See *Franz*, 352 Ill. App. 3d at 1149 ("[e]ven if we may not agree with the trial court's decision not to impose punitive damages, we cannot substitute our judgment for that of the trial court"). Because the evidence supports the trial court's findings that the Taylors and Michael were motivated by greed, not maliciousness toward Erla, we find that a reasonable person could have ruled the way the trial court did. Accordingly, we hold that the trial court did not abuse its discretion in ultimately declining to impose punitive damages. See *id.* (declining to impose punitive damages despite the court's finding of bad faith).

¶ 64 We next determine whether the trial court erred in finding that funds disbursed by Erla's "gifting program" were not subject to recovery. We review this issue under a manifest weight of the evidence standard. See *Lozman v. Putnam*, 379 Ill. App. 3d 807, 820 (2008) (factual findings made by a trial court during a bench trial are reviewed under a manifest weight of the evidence standard).

¶ 65 Prior to Max's death in 1986, Max and Erla started a program of annual gifting to their descendants (the gifting program). This program took advantage of tax laws. Initially, the

gifting program transferred $10,000 annually to each of Max and Erla's children and five grandchildren. Following Max's death, in a letter dated August 20, 1987, Jerry Kaplan (Attorney Kaplan), as counsel for Max and Erla, informed Erla that the Bank's in-house counsel, Stan Richards, "suggested that I advise you to continue the program of gifts to the children and grandchildren started by Max with a view toward diminishing your assets for tax purposes." At trial, Marshall testified that he was aware of Attorney Kaplan's August 1987 letter to Erla, and that between 1987 and 1997, Marshall had a series of conversations with Erla regarding the gifting program. During these conversations, Marshall and Erla discussed the amounts she would need to gift at different times because "more great grandchildren came about." Marshall testified that, at all times, Erla told him that she understood the nature of the gifting program and wanted to continue making these annual gifts. Trial exhibits show that, on April 29, 1996, Marshall wrote a letter to Michael and his wife, Marcy, "to share with [them] both some thoughts [Marshall] [had] regarding [Erla's] assets and the distribution of same." Marshall's letter suggested that they "embark on a program to maximize the transfer of assets to the grandchildren," that they annually gift $10,000 to each of Erla's great grandchildren, and that gifting $10,000 annually to Marcy and Marshall each would "effectively legally transfer[] an extra $10,000 to Michael and Leila." The letter further stated that this program would "maximize getting money out of the estate *** [i]t either goes to each family member or it goes to the government." Marshall testified that in 1996, Erla continued to fill out all of the gifting program checks on her own. Marshall's and Leila's testimony showed that, however, in later years, Marshall and Michael helped Erla fill out the checks that Erla signed because "the number of checks got to be so large [that] she asked for

- 34 -

secretarial help." Trial exhibits showed that on July 23, 1997, Erla signed an updated durable power of attorney that Marshall drafted, which again named Leila and Michael as her agents (the 1997 POA). The 1997 POA resembled the terms of the 1994 POA, with the exception of an added paragraph regarding the gifting program. The relevant portions of the 1997 POA directed that annual gifts to Erla's "children, their spouses, [her] grandchildren and [her] great grandchildren including those not yet born be continued in an amount to each equal to the maximum permitted by law to be transferrable free of any gift tax." At trial, Marshall testified that, after drafting the 1997 POA, he presented it to Erla and explained the added language to her. Erla, who read over the added language, agreed to the language terns and signed the 1997 POA without asking Marshall any questions. In May 1999, Michael and Leila exercised the 1997 POA to include Aunt Frieda (Max's sister) as a recipient of the gifting program, who received $10,000 annually from the Max Trust until her death in 2005.

¶ 66    The trial court found that funds disbursed by the gifting program were not subject to recovery:

>"[S]uch program was wisely implemented to take advantage of the annual gift tax exclusions and that all of the Feinberg family members benefitted from the program. The evidence established that Erla was aware of the gift-giving program, she signed all the checks, and the gifts were given to her children, grandchildren and great grandchildren and all shared equally as a result of the program."

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

¶ 67    Michele argues that the trial court's ruling was erroneous because "wise tax planning" was not a valid defense to financially exploiting the elderly or tortiously interfering with her testamentary expectancy. She contends that, even if it were a valid defense, there was no evidence that the gifting program saved any estate taxes and that Erla's estate "probably lost [money]" as a result of Marshall's expanded gifting program. Michele argues that there was no evidence that Erla understood the expansion of the gifting program, and that the Taylors and Michael did not rebut the presumption that the expanded gifting program was the product of fraud. Michele further contends that, contrary to the trial court's factual finding, the descendants did not share equally under the expanded gifting program because she was unmarried and had no children at the time it was implemented.

¶ 68    The Taylors counter that Michele's arguments should be stricken for failure to cite the relevant standard of review, pursuant to Illinois Supreme Court Rule 341(h) (eff. Sept. 1, 2006). They argue that, even if not stricken, the trial court's finding was not against the manifest weight of the evidence because the expanded gifting program sought to distribute wealth to as many family members as possible without tax consequences. The Taylors point out that Michele herself received a total of $170,000 from the gifting program over 17 years, and that Michele had endorsed the family's goals to "decrease the inheritance tax burden." Michael adopts the arguments proffered by the Taylors on this issue.

¶ 69    As discussed, once a fiduciary relationship is established, any transaction between the parties which benefits the dominant party is presumed to be fraudulent. *Lemp*, 170 Ill. App. 3d at 757. The dominant party then has the burden of proving by clear and convincing evidence that

- 36 -

the transaction was fair and equitable, and did not result from his undue influence over the servient party. *Id.* Factors in meeting the burden of proof to rebut the presumption of fraud include: "(1) showing that, before the transaction, the fiduciary made a frank disclosure of all relevant information; (2) the fiduciary paid adequate consideration for the transaction; and (3) the principal had competent and independent legal advice." *In re Estate of Teall*, 329 Ill. App. 3d at 88.

¶ 70 We examine this issue on its merits and decline the Taylors' invitation to strike Michele's arguments for failing to cite the relevant standard of review. Based on our review of the record, we find no basis to question the trial court's assessment of the evidence. The record shows that the gifting program began prior to Max's death in 1986 and was later expanded to include gifting to Erla's great grandchildren around 1996 or 1997, at a time when the Taylors and Michael had a fiduciary relationship with Erla. While it is true that the gifting program expanded to include an annual gifting of $10,000 to Marcy and Marshall, Marshall explained that doing so would "effectively legally transfer[] an extra $10,000 to Michael and Leila." The most dramatic aspect of the expanded gifting program was the inclusion of Erla's great grandchildren (the Taylors' and Michael's grandchildren) as recipients under the gifting program. Indeed, Michele's reply brief clarifies that she *only* sought to recover the approximately $440,000 disbursed to these great grandchildren under the gifting program. Because Michele only sought to recover the funds given to the great grandchildren, but not those disbursed to the Taylors or Michael as Erla's fiduciaries, she cannot now argue that the presumption of fraud was triggered as to them. Thus, the Taylors and Michael need not provide any evidence to rebut the presumption.

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

¶ 71 Even assuming, *arguendo*, that the Taylors and Michael somehow personally profited from the disbursement of funds to Erla's great grandchildren under the gifting program, that does not negate the underlying reason for expanding the gifting program, specifically as a way to diminish the estate's tax burdens. The gifting program was implemented prior to Max's death in 1986, and Attorney Kaplan had advised Erla to continue making annual gifts to her descendants after Max's death. There was no evidence that Erla was mentally deficient when Marshall explained to her the benefits of expanding the gifting program, nor was there any indication of her failure to understand the gifting program when she executed the 1997 POA. Indeed, evidence was presented to the trial court that Erla was filling out the checks on her own until at least 1996. While the circumstances surrounding Erla's signing of the 1997 POA primarily stemmed from Marshall's testimony, it was within the trial court's province to weigh and determine the credibility of his testimony. *In re Estate of Teall*, 329 Ill. App. 3d at 91 (it is within trial court's province to hear and weigh the evidence and determine the credibility of the witnesses). Accordingly, we conclude that the trial court's finding was consistent with the manifest weight of the evidence.

¶ 72 We next determine whether the trial court erred in declining to impose constructive trusts against the Taylors and Michael, which we review under an abuse of discretion standard. See *Dealer Management Systems, Inc. v. Design Automotive Group, Inc.*, 355 Ill. App. 3d 416, 419 (2005) (whether to award relief from a judgment lies within the sound discretion of the trial court).

¶ 73 In the May 16, 2011 order, the trial court granted the Bank's recovery citation, stating that "[t]he total amount that [the Taylors] [were] deemed to hold in constructive trust for the benefit of [the Erla Trust] [was] $1,911,107 plus the [Bank's] reasonable attorney fees and costs," and that

- 38 -

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

"[t]he total amount that Michael [was] deemed to hold in constructive trust for the benefit of [the Erla Trust] [was] $788,957 plus the [Bank's] reasonable attorney fees and costs." Thereafter, the Bank issued *postjudgment* citations to discover assets (postjudgment citations) against the Taylors and their financial institutions, in an attempt to trace the assets that the Taylors had misappropriated from the Erla Trust; to determine the current value of those funds; and to recover any returns on investments made on the misappropriated funds. Subsequently, on August 5, 2011, the Taylors satisfied the $1,911,107 judgment against them. The Bank then dismissed the postjudgment citations against the Taylors' financial institutions, but refused to dismiss the postjudgment citations against the Taylors personally. On August 9, 2011, the Taylors filed a motion to quash the remaining postjudgment citations, arguing that they had already paid the face value of the judgment against them. In response, on August 10, 2011, the Bank argued that the trial court's May 16, 2011 order imposed a constructive trust against the Taylors, which "creat[ed] a new obligation on [the Bank] to determine the current value of those trust assets taken by the Taylors and restore them to the Erla Trust," along with any gains in investments that the Taylors may have earned as a result of retaining the misappropriated funds. On August 12, 2011, the trial court granted the Taylors' motion to quash the postjudgment citations, clarifying that its May 16, 2011 order "entered a money judgment as to a fixed dollar amount."

¶ 74    Michele argues on appeal that the trial court's August 12, 2011 order granting the Taylors' motion to quash the Bank's postjudgment citations, directly contradicted its May 16, 2011 order which imposed constructive trusts against the Taylors and Michael. She further contends that the trial court's August 12, 2011 order was grossly inequitable.

- 39 -

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

¶ 75    The Taylors counter that the trial court did not err in declining to impose constructive trusts against them.   They argue that the trial court's August 12, 2011 order confirmed that the May 16, 2011 order entered only a money judgment, rather than a constructive trust, against the Taylors. The Taylors further contend that this court need not resolve this issue because the imposition of constructive trusts was not a remedy pursued in the recovery citation at trial, and that the remedy was only pursued in Michele's separate tort action for intentional interference with a testamentary expectancy against the Taylors and Michael.   Neither the Bank nor Michael raised any arguments pertaining to this issue on appeal.

¶ 76    The purpose of a constructive trust is to prevent unjust enrichment.   *A.T. Kearney, Inc. v. INCA International, Inc.*, 132 Ill. App. 3d 655, 665 (1985).   "Where a defendant has obtained money to which he is not entitled, under such circumstances that in equity and good conscience he ought not to retain it, the rightful owners of the money can claim it through a constructive trust to avoid unjust enrichment."   (Internal quotation marks omitted.)   *Norton v. City of Chicago*, 293 Ill. App. 3d 620, 628-29 (1997).

¶ 77    We find Michele's arguments to be without merit.   Although the court's May 16, 2011 order, in granting the Bank's recovery citation, used the term "constructive trust" to describe the misappropriated funds held by the Taylors and Michael, the imposition of constructive trusts was not a remedy pursued by the Bank's recovery citation at trial.   Rather, it was a remedy pursued only by Michele in her separate tort action against the parties at trial, which the court found to be "duplicative" of the recovery citation.   Indeed, the trial court's August 12, 2011 order, which granted the Taylors' motion to quash, clearly confirmed that the court had only entered a "money

- 40 -

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

judgment as to a fixed dollar amount" against the Taylors and Michael in its previous May 16, 2011 order. Thus, we find that the court's usage of the term "constructive trust" was a matter of semantics used to describe the process by which the Taylors and Michael diverted funds from the rightful owner, rather than a specific remedy imposed by the court. Even had the trial court actually imposed constructive trusts against the Taylors and Michael for the amounts specified in the court's May 16, 2011 order, we find no reason to disturb the trial court's decision not to increase the judgment amounts by the then present value of the funds and any profits made by the Taylors and Michael as a result of those funds. See generally *A.T. Kearney, Inc.*, 132 Ill. App. 3d at 665 (constructive trust imposed against defendant for $106,452, the exact amount of money defendant actually received); *Sadacca v. Monhart*, 128 Ill. App. 3d 250, 257 (1984) (constructive trust imposed against defendant for the exact amount of money she wrongfully received). In fact, in the May 16, 2011 order, the trial court rejected Michele's claim that she was entitled to a judgment against the Taylors and Michael for the present value of the misappropriated funds, finding that the testimony of Michele's trial expert witness, Stringer, was unclear, "based on conjecture" and unpersuasive with regard to the present day value of the funds taken by the Taylors and Michael. Accordingly, we hold that the trial court did not abuse is discretion in declining to impose constructive trusts against the Taylors and Michael.

¶ 78     We next determine whether the trial court erred in finding that evidence at trial was insufficient to subject Erla's Florida condominium to recovery, which we also review under a manifest weight of the evidence standard. See *Lozman*, 379 Ill. App. 3d at 820.

- 41 -

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

¶ 79    In 1972, Erla purchased a condominium in Aventura, Florida (the Florida condominium), which she solely owned until 1990.   In June 1990, Erla executed a warranty deed transferring her sole ownership interest in the Florida condominium to joint tenancy between Erla, Michael and Leila.   The warranty deed was drafted by Marshall and signed by Erla.   The terms of the warranty deed specified that Erla had received "good and valuable" consideration from Michael and Leila.   The parties stipulated that on July 1, 1990, the warranty deed transferring the Florida condominium to Erla, Michael and Leila as joint tenants was recorded with the county recorder of deeds.   Marshall testified that no attorney was involved in the deed transfer, and that, to his knowledge, Erla did not consult any legal or financial advisors in connection with the transaction. In 1996, Michael and Leila entered into an agreement in which they agreed to pay equally all expenses required for the maintenance of the Florida condominium and to sell the property either upon Erla's death or when she could no longer live independently on the property.

¶ 80    The trial court held that the evidence at trial was insufficient to subject the Florida condominium to recovery under the recovery citation.

¶ 81    Michele argues that the trial court's ruling was against the manifest weight of the evidence because Marshall and Michael, who were Erla's fiduciaries since 1986, failed to rebut the presumption that the 1990 deed transfer of the Florida condominium was fraudulent.

¶ 82    Marshall argues that the trial court's ruling was not against the manifest weight of the evidence, where Erla was indisputably competent at the time she executed the warranty deed and no party provided any valuation of the Florida condominium at trial.   Michael adopts Marshall's arguments pertaining to this issue on appeal.

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

¶ 83    We find that the trial court's ruling was not supported by the manifest weight of the evidence.    At the time Erla transferred ownership of the Florida condominium into a joint tenancy between herself, Michael and Leila, Marshall and Michael had fiduciary relationships with Erla. Additionally, Marshall, the drafter of the deed which transferred the property, was Leila's husband. Thus, we find that the transaction is presumptively fraudulent.    See *Lemp*, 170 Ill. App. 3d at 757. The burden was upon Michael, Leila and Marshall to prove by clear and convincing evidence that the transaction was fair and equitable and did not result from their undue influence over Erla.    See *id.*    Although Erla was competent at the time that she executed the deed which transferred the property and the deed states that she received "good and valuable" consideration, clear and convincing evidence did not exist establishing that the transaction was fair and equitable and that it was not the result of undue influence.    Such scant evidence is grossly insufficient to overcome the presumption of fraud which arose from the transfer.    Therefore, we hold that the trial court's refusal to subject the Florida condominium to recovery was against the manifest weight of the evidence and we reverse its determination on the issue.

¶ 84    Next, we determine whether the trial court erred in finding that the remaining counts of Michele's tort action alleging intentional interference with testamentary expectancy need not proceed as they were duplicative of the remedy sought in the recovery citation.

¶ 85    In 2004, Michele filed a lawsuit against Michael and the Taylors in the law division of the circuit court, alleging that they misappropriated millions of dollars in assets from Max's and Erla's estates (case No. 04 L 7195).    In the third amended complaint, Michele alleged counts for intentional interference with testamentary expectancy (counts I and II), conspiracy by the Taylors

- 43 -

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

and Michael to intentionally interfere with testamentary expectancy (count III), and requested that a constructive trust be imposed against them for assets which they had misappropriated from Erla and the estates of Max and Erla (count IV). In 2007, the Bank, as corporate trustee of the Feinberg Trusts, filed the instant recovery citation to recover assets against Michael and the Taylors. Both the recovery citation and Michele's tort action were the subject of the instant trial. At trial, the trial court granted a motion for directed finding in favor of the Taylors and Michael on count III of Michele's third amended complaint. In the May 16, 2011 order, in granting the recovery citation, the trial court found that the remaining counts of Michele's tort action for intentional interference with testamentary expectancy need not proceed as they were duplicative of the remedy sought in the recovery citation. The trial court, citing *In re Estate of Roeseler*, 287 Ill. App. 3d 1003 (1997), noted that Michele had not been "additionally damaged by the tortious conduct" of Michael and the Taylors, and that the remedy sought in the recovery citation under the Probate Act (755 ILCS 5/16-1 (West 2010)) was sufficient and adequate to grant Michele the relief to which was entitled.

¶ 86    Michele argues that she should have been allowed to proceed with her tort action alleging intentional interference with expectancy, arguing that the remedy provided in the recovery citation was inadequate to grant her relief. She contends that *In re Estate of Roeseler* was inapplicable and that her tort action was not "duplicative" of the Bank's recovery citation because her tort action was filed prior to the Bank's filing of the recovery citation. Michele further asserts that the trial court had in fact ruled on the merits of some claims found only in Michele's tort action, such as the claim of conspiracy (count III), but that the court had ignored her allegation that she was injured by

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

Marshall's "manipulation of Max and Erla['s] estate plans to benefit the Taylor family at Michele's expense."

¶ 87 The Taylors counter that the trial court properly found that the recovery citation provided Michele with a sufficient and adequate remedy. They contend that Michele's tort claim for intentional interference with testamentary expectancy was based on her alleged 12.5% share of the Erla Trust, which was identical to the share percentage Michele was entitled to receive pursuant to the recovery citation. The Taylors note that in fact, Michele had already received her full distribution from the Erla Trust. Thus, they argue, Michele's alleged damages pursuant to her tort action were entirely duplicative of her share of recovery pursuant to the citation. The Taylors further argue that the recovery citation's probate remedies were not only available to Michele, but that she had actively joined as a party to the recovery citation. The Taylors argue, in the alternative, that even if Michele's tort claim was not duplicative of the recovery citation, the record was replete with evidence to deny it.

¶ 88 Michael argues that the trial court properly determined that Michele's claim of intentional interference with testamentary expectancy was duplicative of the recovery citation, where Michele sought exactly the same recovery as the Bank did in its citation–that is, the funds which were misappropriated from Erla. Michael points out that the Bank's recovery citation, "secured for Michele, and all other beneficiaries of Erla's [T]rust and estate, exactly the same amounts from Michael which had been sought by way of Michele's interference with an expectancy claim." Michael further contends that the mere fact that punitive damages might have been recoverable

- 45 -

under Michele's tort claim, but not under the recovery citation, did not justify maintaining a separate claim for intentional interference with testamentary expectancy.

¶ 89    In *In re Estate of Roeseler*, the decedent's stepdaughter, who was omitted from the decedent's final will, brought a will contest against the respondents alleging lack of testamentary capacity and undue influence, as well as a tort action for intentional interference with her economic expectancy under the decedent's will.    *In re Estate of Roeseler*, 287 Ill. App. 3d at 1005. The respondents filed a motion for summary judgment as to the stepdaughter's will contest petition, which the trial court granted.    *Id.*    Thereafter, the trial court dismissed the stepdaughter's tort action for intentional interference, on the ground that the wrongful conduct alleged therein was identical to the conduct alleged in her petition for will contest which had been defeated on summary judgment.    *Id.*    On appeal, the reviewing court found that fact questions as to whether the decedent lacked testamentary capacity or whether the beneficiaries exerted undue influence over him precluded summary judgment.    *Id.* at 1015, 1019.    The reviewing court further held that the dismissal of the stepdaughter's tort action for intentional interference was premature, stating that "the availability of probate relief [was] only speculative pending the consideration of the decedent's prior wills by the probate court."    *Id.* at 1021-22.    The reviewing court stated in general that where "a will contest is available and would provide an adequate remedy to the petitioner, no tort action will lie," but that "if no adequate remedy is available through probate proceedings, a tort action is permissible."    *Id.* at 1021.    The reviewing court noted that, if on remand the stepdaughter succeeds in her will contest, then dismissal of her tort claim would be appropriate because the probate proceedings would provide an adequate remedy to her.    *Id.*

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

¶ 90    We find that the trial court did not err in finding that the remaining counts of Michele's tort action for intentional interference with testamentary expectancy need not proceed as they were duplicative of the remedy sought in the recovery citation.   While *In re Estate of Roeseler* dealt with the probate remedy afforded by way of a will contest, we find that the recovery citation in the instant case is likewise a probate remedy under the Probate Act (755 ILCS 5/16-1 (West 2010)). Thus, applying the principles of *In re Estate of Roeseler*, we find that a probate remedy was made available to Michele pursuant to the recovery citation, to which she was a party, and that the remedy sought in the recovery citation was adequate to grant Michele proper relief in recovering assets from the Taylors and Michael.   The mere fact that punitive damages were alleged in Michele's tort claim, but not in the recovery citation, could not provide a basis for the tort action to proceed.   See *In re Estate of Roeseler*, 287 Ill. App. 3d at 1021 ("[i]n determining the adequacy of the relief, an award for punitive damages is not considered a valid expectation").

¶ 91    Nonetheless, Michele argues that the recovery of assets to the Erla Trust pursuant to the recovery citation did not afford an adequate remedy because they did not encompass the "*inter vivos* transfers" made during Erla's lifetime.   In support of this argument, Michele points to count I of her tort action, which alleged that Marshall improperly manipulated Erla's estate plans.   We disagree.

¶ 92    In count I of Michele's tort action for intentional interference with testamentary expectancy, she alleged that Marshall manipulated the Feinberg estate plans by drafting Erla's 1997 appointment over the Max Trust and the second amendment to the Erla Trust, which in effect allowed the Taylor family to receive more money from the estates at the expense of the Feinberg

- 47 -

family, including Michele. We find Michele's argument to be unpersuasive. Erla's exercise of her power of appointment over the Max Trust pursuant to the 1997 appointment, and her execution of the second amendment which deleted the Jewish clause from the Erla Trust, could not be considered "*inter vivos* transfers" of property because Erla was free to execute subsequent amendments to her trust and retained the power of appointment over the Max Trust until her death in 2003.

¶ 93    Even assuming, *arguendo*, that the 1997 appointment and the second amendment were lifetime transfers of Erla's property, we find that Michele stood to inherit money from the Erla Trust as a direct result of the deletion of the Jewish clause in the Erla Trust by the second amendment. As the trial court noted, Michele had not been "additionally damaged" by the conduct of the Taylors and Michael so as to warrant maintaining a separate tort action against them. Michele further argues that her tort action was not duplicative of the recovery citation on the basis that her tort action was filed prior to the recovery citation. We reject this contention. Both the recovery citation and Michele's tort action were before the court at the same time at trial. We further find Michele's cited cases to be misplaced, where the issues at the heart of those cases pertained to the statute of limitations applicable to bringing a claim for intentional interference with expectancy, rather than a determination on whether the tort claim was duplicative of other available probate relief. See *Bjork v. O'Meara*, 2013 IL 114044 (tortious interference with testamentary expectancy claim was governed by statute of limitations for claims to recover personal property); *In re Estate of Luccio*, 2012 IL App (1st) 121153 (whether the six-month limitation on trust challenges applied to a claim for intentional interference with inheritance

- 48 -

expectancy); *In re Estate of Ellis*, 236 Ill. 2d 45 (2009) (six-month limitation period did not apply to charitable hospital's tort claim for tortious interference with an inheritance expectancy); but see *DeHart v. DeHart*, 2012 IL App (3d) 090773, ¶ 34 (remanding case to determine whether will contest pending before probate court would be successful).   Accordingly, we hold that the trial court did not err in finding that the remaining counts of Michele's tort action for intentional interference with testamentary expectancy need not proceed as they were duplicative of the remedy sought in the recovery citation.

¶ 94    We next determine whether the trial court erred in approving the terms of the distribution plan as proposed by the Bank.

¶ 95    On August 19, 2011, three months after the trial court granted the Bank's recovery citation, the Bank filed a petition for instructions seeking guidance from the trial court on how the assets of the Feinberg Trusts should be distributed.   The petition for instructions proposed that the trial court resolve certain issues, including whether the 1997 appointment and the second amendment to the Erla Trust were valid, before any trust assets would be distributed.   In response, the Taylors argued that the 1997 appointment and the second amendment were invalid.   On January 11, 2012, the trial court denied the petition for instructions, finding that the "time for contests regarding the validity of the testamentary documents has long since passed."   The trial court found that our supreme court's 2009 ruling was law of the case, and that the 1997 appointment and the second amendment were not the subject of contests before the supreme court and "they cannot be the subject of a contest now."   See *In re Estate of Feinberg*, 235 Ill. 2d 256.   Thereafter, on May 25, 2012, the Bank filed a proposed distribution plan, which set forth the terms for distributing the

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

Feinberg Trusts assets to the beneficiaries. On August 10, 2012, the trial court approved the Bank's proposed distribution plan and ordered the Bank to distribute the funds from the Feinberg Trusts accordingly.

¶ 96 Michele argues that the trial court erred in approving the terms of the distribution plan, on the grounds that the 1997 appointment was unenforceable because it exceeded the power of appointment bestowed upon Erla by Max in his trust. The 1997 appointment specified that, upon Erla's death, the $250,000 share of each grandchild who was deemed deceased under the Max Trust "shall be paid equally to the *parents* of that grandchild." (Emphasis added.) However, the terms of the Max Trust only granted Erla the power to appoint assets from his trust to his *descendants*, which only included Max's children and grandchildren, but not the spouses of his children. Michele argues that, because Marshall (father of Lisa and Aimee) and Marion (mother of Michele and Aron, and ex-wife of Michael) were the *parents* of Max's "deceased" grandchildren under his trust but were not Max's descendants, the 1997 appointment exceeded the scope of Erla's power of appointment and was thus invalid.

¶ 97 As discussed in our ruling on the Taylors' appeal, the time for challenging the validity of the 1997 appointment has long passed. Further, the law-of-the-case doctrine bars Michele's challenge to the validity of the 1997 appointment, where neither Michele nor any other party made any assertions during their prior appeal to our supreme court, that the 1997 appointment was invalid. Rather, our supreme court's previous ruling in this case explicitly relied upon the existence and validity of the 1997 appointment in reaching its decision regarding the terms of the Max Trust. See *id.* at 281. To reconsider the validity of the 1997 appointment at this juncture in

the litigation after our supreme court had specifically relied upon its validity would violate the settled expectations of the parties and undermine consistency in the court's rulings. Thus, we reject Michele's assertion that the 1997 appointment was unenforceable.

¶ 98    Michele argues in the alternative, and the Taylors agree, that if the 1997 appointment is upheld, it must be strictly enforced according to its exact terms.   Michele posits that the trial court erred in approving the distribution plan because it allowed each of the $250,000 shares belonging to the four "deceased" grandchildren (Michele, Aron, Lisa and Aimee) to be distributed equally to Michael and Leila, but not to Marshall and Marion, even though they were all *parents* to these "deceased" grandchildren.   As discussed in our ruling on the Taylors' appeal, we find that Marshall and Marion were not descendants of Max and thus were ineligible to take under the 1997 appointment.[7]   While the 1997 appointment used the plural term "parents" instead of the singular term "parent" in describing who may inherit the "deceased" grandchildren's $250,000 shares, Marshall testified at trial that it was a drafting "typo" and that Erla did not have the power under the Max Trust to appoint its assets to anyone other than Max's descendants.   See *Whittaker v. Stables*, 339 Ill. App. 3d 943, 946-47 (2003) (a court's main concern in construing a trust is to determine the intent of the creator of the instrument when it was executed).   Therefore, we reject Michele's argument on this basis.

¶ 99    Nonetheless, Michele further contends that the trial court erred in approving the distribution plan, which had deemed her "deceased" under the Max Trust, by arguing that the

_____

[7] The terms of the Max Trust provided that, upon Erla's death, the assets in the Max Trust would be distributed amongst their children and grandchildren.   Because Marshall and Marion were only the spouses of the adult children of Erla and Max, they were not "descendants" under the Max Trust.

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

Jewish clause in the Max Trust was unenforceable because it violated Illinois public policy. Michele posits that, after making the distributions as specified by the 1997 appointment, approximately $373,893 remained in the Max Trust which should be distributed to Max's descendants without regard to the Jewish clause in the Max Trust.   In support of this contention, Michele asserts that this court's holding in the prior appeal (*In re Estate of Feinberg*, 383 Ill. App. 3d 992), in which we held that the Jewish clause in the Max Trust violated public policy, should be considered the "law of the case" because our supreme court reversed this court's holding on other grounds.   See *In re Estate of Feinberg*, 235 Ill. 2d 256.   Thus, Michele argues, the trial court erred in approving the distribution plan because it called for the distribution of assets consistent with the terms of the Jewish clause of the Max Trust.

¶ 100   The Taylors counter that the issue regarding the Jewish clause in the Max Trust was resolved by our supreme court in the prior appeal, and that Michele's attempt to relitigate our supreme court's decision must be rejected.   The Bank argues that the validity of the Jewish clause in the Max Trust remained the law of the case by our supreme court's decision in the prior appeal. Michael adopts the Bank's position as to the validity of the final distribution plan.

¶ 101   We find that our supreme court's decision in the prior appeal regarding the issue of the Jewish clause in the Max Trust is law of the case and it cannot be reexamined on a second appeal before this court because there have been no material changes in the facts since the prior appeal. See *In re Christopher K.*, 217 Ill. 2d at 365.   While Michele argues that our supreme court never validated the Jewish clause in the Max Trust, and cites to certain language in our supreme court's opinion to suggest that it had never determined whether the Jewish clause was enforceable, we find

- 52 -

that our supreme court's ruling regarding the Jewish clause's impact upon distributions made pursuant to the 1997 appointment also applied to the remaining assets in the Max Trust. Moreover, there is no legal authority to support Michele's assertion that an appellate court decision resolving a single interlocutory issue, which has been reversed by our supreme court, albeit on more narrow grounds, holds any precedential value on remand and on a second appeal. Therefore, we hold that the trial court did not err in approving the distribution plan as proposed by the Bank.

¶ 102    We next determine whether the trial court abused its discretion in awarding no more than $100,000 in reasonable attorney fees to Michele.   See *Shoreline Towers Condominium Ass'n v. Gassman*, 404 Ill. App. 3d 1013, 1024 (2010) (the dollar amount of the attorney fee award is reviewed under an abuse of discretion standard).

¶ 103    Michele argues that the trial court improperly awarded only $100,000 to her for reasonable attorney fees.   She points out that the recovery of assets to the Erla Trust would not have been possible without her efforts to investigate the misconduct that ultimately led to the Bank's filing of its recovery citation.   She contends that the relief sought in her separate lawsuit against the Taylors and Michael pertained to all of the assets that they had misappropriated from the Erla Trust, not just the portion of assets that Michele was entitled to receive.   Michele asserts that she is entitled to additional reasonable attorney fees and that the trial court should have applied either the "percentage of the fund method" or the "lodestar method" in calculating her fee award.

¶ 104    The Taylors counter that Michele was not entitled to additional attorney fees, arguing that she did not prevail in her separate lawsuit against them at trial, and that Michele did not act in the

interest of all of the alleged beneficiaries so as to trigger the application of the common fund doctrine. They contend that Michele should have joined the Bank's recovery efforts sooner rather than pursuing recovery on her own behalf through her separate lawsuit against the Taylors and Michael. The Taylors posit that the trial court's award of $100,000 in attorney fees to Michele, combined with the $540,000 in attorney fees awarded to the Bank for its recovery of the misappropriated assets, was reasonable because it represented approximately 24% of the recovered funds. They further contend that Michele could have assisted the Bank with the recovery efforts without incurring unnecessary legal fees, that she failed to prove that the lodestar method governs in calculating attorney fees, and that Michele's own misconduct in prolonging the instant litigation should be considered by the court. Michael adopts the Taylors' position that Michele is not entitled to additional attorney fees.

¶ 105 The Bank argues that the trial court acted within its discretion in awarding Michele $100,000 in attorney fees, where the record supports the trial court's finding that the Bank, as trustee of the Feinberg Trusts, was well-equipped to litigate its recovery citation and Michele's lawsuit against the Taylors and Michael were largely duplicative of the actions taken by the Bank. The Bank asserts that although Michele was helpful in uncovering many facts that led to the filing of the Bank's recovery citation, Michele pursued additional claims, such as a claim for punitive damages, which would have benefitted her alone.

¶ 106 On June 14, 2011, Michele filed a petition for attorney fees before the trial court, alleging that she incurred a total of $765,737.50 in legal fees and $12,352.15 in costs relating to her efforts to recover the assets that the Taylors and Michael had misappropriated from Erla. On May 17,

2012, the trial court entered an order awarding Michele $100,000 in attorney fees.   Specifically, the court said:

"From this court's extensive and years-long experience with both the Max and Erla Feinberg estates, it is clear that [Michele] initiated the investigation of the claims that ultimately led to a recovery herein.   Moreover, her efforts contributed to the discovery of facts and evidence that ultimately led [the Bank] to issue citations to discover and later to convert its discovery citations to recovery citations which were issued by this court on or about May, 2007. The court finds that the actions of [Michele's] attorneys conferred a compensable benefit on the Feinberg estate.

\* \* \*

However, Michele was ultimately not successful in prosecuting her [c]omplaint.   After trial, this court found in favor of the [c]itation [p]etitioner and against [Michele] on her claim of tortious interference.   This court determined that she failed to succeed on her cause of action primarily because it was duplicative of the [Bank's] [recovery] [c]itation and the law in Illinois prohibits recovery in such circumstance.   The [Bank] was well able and well-equipped to litigate its citations and if the [Bank] needed assistance in prosecuting its citations, then [Michele's] counsel

- 55 -

could have filed an additional [a]ppearance on behalf of the [Bank]. That did not occur. Instead, [Michele] pursued her own cause of litigation for her benefit, a benefit which she hoped would result in the award of punitive damages for her alone. Moreover, this court ultimately awarded a determinate money judgment against the citation respondents.

This court cannot additionally burden the estate with the payment of [Michele's] attorneys' fees for work that the [Bank] [was] duty-bound to perform in prosecuting the citation. And this court cannot additionally burden the estate with payment of [Michele's] fees for pursuing an action that she believed would ultimately benefit her alone.

With regards to the compensable benefit that [Michele's] lawyers conferred on this estate, this court has reviewed the fee petition and detailed billing records submitted in support. The court finds that [Michele's] attorneys are entitled to receive from the 'common fund' those reasonable fees incurred from the date they were retained through the date the [Bank's] [recovery citation] was issued. The court finds that the fair and reasonable amount for such fees to be $100,000.00, said amount to be paid *** from the amounts recovered pursuant to the [c]itation."

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

¶ 107   Based on our review of the record, we find that the trial court acted within its discretion in awarding $100,000 to Michele in attorney fees.   As discussed, Michele filed a complaint for intentional interference with testamentary expectancy against the Taylors and Michael in 2004. In 2005, the Bank filed a discovery citation against the Taylors and Michael, which was later converted into the instant recovery citation in 2007.   Rather than joining the Bank's recovery efforts immediately, Michele chose to maintain her separate lawsuit against the Taylors and Michael and waited until 2009 before joining as a party to the Bank's recovery citation.   Although Michele's complaint sought the return of the misappropriated funds to the Erla Trust, we find that it was largely duplicative of the actions taken by the Bank.   As the trial court correctly noted, the Bank was "well able and well-equipped to litigate its citations," and Michele's counsel could have assisted the Bank as needed.   We find that the trial court's determination that Michele's attorneys should only be compensated for fees incurred from the date they were retained through the date the Bank's recovery citation was issued, was not an abuse of discretion.   We cannot conclude that no reasonable person could take the view adopted by the trial court.   For these reasons, we reject Michele's argument that she was entitled to additional attorney fees and that the trial court should have calculated her attorney fees based on the "percentage of the fund method," which reflects a percentage of the recovered funds, or the "lodestar method," which reflects the amount of work performed by the attorney.   As the trial court noted, Erla's estate should not be additionally burdened by the payment of Michele's attorneys fees for work that the Bank was duty-bound to perform in prosecuting the recovery citation.   Therefore, we hold that the trial court did not abuse its discretion in awarding $100,000 in reasonable attorney fees to Michele.

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

¶ 108   We now turn to the Bank's arguments on cross-appeal.   On cross-appeal, the Bank's sole argument is that the trial court erred in denying its request for prejudgment interest on the recovered assets that were returned to the Erla Trust.   The decision to award prejudgment interest is a matter left to the sound discretion of the trial court and will not be reversed absent an abuse of discretion.   *Santa's Best Craft, L.L.C. v. Zurich American Insurance Co.*, 408 Ill. App. 3d 173, 191 (2010).   However, questions of fact such as whether a party's conduct was "unreasonable and vexatious" will not be disturbed unless it is contrary to the manifest weight of the evidence. *Charles Selon & Associates, Inc. v. Estate of Aisenberg*, 103 Ill. App. 3d 797, 801 (1981).

¶ 109   On May 16, 2011, the trial court granted the Bank's recovery citation but denied its request for prejudgment interest on the recovered assets, finding that "[t]his court has reviewed the Illinois Interest Act with regards to the requested award of pre-judgment interest and finds [] the Act to be inapplicable to the factual circumstances presented here.   The court declines to find that the failure to remit the funds taken from Erla was 'unreasonable and vexatious.' "

¶ 110   The Bank argues that the trial court erred by not awarding prejudgment interest to the Erla Trust, arguing that the trial court improperly failed to consider whether prejudgment interest was warranted by equitable considerations and that the court's application of the Illinois Interest Act was erroneous.   Michele does not appeal the issue of prejudgment interest.

¶ 111   The Taylors counter that the trial court properly denied the Bank's request for prejudgment interest, arguing that the Illinois Interest Act was inapplicable to non-contract claims and that the Bank forfeited any right to claim prejudgment interest based on equitable considerations.   They contend that, forfeiture aside, the record supported the court's decision to deny prejudgment

- 58 -

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

interest.   Further, they argue that there was sufficient evidence to support the trial court's findings that they did not act unreasonably or vexatiously under the Illinois Interest Act.

¶ 112   Michael argues that the trial court did not abuse its discretion in declining to award prejudgment interest, arguing that the Illinois Interest Act was inapplicable and that the Bank forfeited any claim to prejudgment interest based on equitable considerations.   Michael contends that the court's decision should be viewed in light of the fact that it had imposed substantial attorney fees upon him; that its decision was based on equitable considerations; and that the trial court, in making its ruling, did not misapply the Illinois Interest Act.

¶ 113   Section 2 of the Illinois Interest Act (the Act) provides in pertinent part that:

> "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment."   815 ILCS 205/2 (West 2010).

¶ 114   First, the Bank argues that the trial court erred in failing to consider equitable considerations in declining to award prejudgment interest, stating that equity required that the Erla Trust be awarded prejudgment interest for the Taylors' and Michael's retention of Erla's money

- 59 -

long after her death in 2003.   The Bank posits that the Taylors and Michael continued to enjoy the benefits of the misappropriated funds after Erla's death, and that simply returning the principal amounts to the Erla Trust did not adequately compensate the Erla Trust as a whole.   The Taylors and Michael counter that the Bank forfeited review of its equity arguments on appeal.

¶ 115   We find that the Bank forfeited review of its equity arguments on appeal.   The record shows, in the trial court, the Bank's recovery citation generically sought "prejudgment interest" and that the Bank relied exclusively on the Act as the sole basis for its claim for prejudgment interest.   At trial, the Bank presented the testimony of its expert witness, Thullen, who testified that in calculating the amount of prejudgment interest due to the Erla Trust, he applied a 5% interest rate–the exact same rate specified by the Act.   Further, the Bank's posttrial "proposed findings of fact and conclusions of law" before the trial court specifically requested prejudgment interest pursuant to the Act and made no mention of equity considerations as grounds for warranting prejudgment interest.   Because the Bank never presented its claim for prejudgment interest to the trial court on the basis of equity, but chose only to prove the claim pursuant to the Act, the trial court had no opportunity to address this issue or to give this court the benefit of the trial court's observations with regard to any equitable considerations or arguments.   See *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 93 (failure to raise an argument before the trial court results in forfeiture of that argument on appeal); *Kamelgard v. American College of Surgeons*, 385 Ill. App. 3d 675, 681 (2008) ("[a] primary purpose of the waiver rule is to ensure that the trial court has the opportunity to correct the error"); see also *Carson Pirie Scott & Co. v. State of Illinois Department of Employment Security*, 131 Ill. 2d 23, 49 (1989) (where plaintiff's posttrial motion

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

relied solely on the alleged invalidation of an administrative rule but failed to seek relief in the trial court on the basis of other alleged rule invalidations, any such claim was forfeited for purposes of appeal).

¶ 116   Nonetheless, the Bank argues that its claim for prejudgment interest based on equitable considerations was not forfeited for review on appeal, arguing that Michele presented the testimony of her expert witness, Stringer, who testified to using treasury rates, rather than the Act, to calculate the possible amount of prejudgment interest owed to the Erla Trust.   The Bank asserts that, once Stringer's testimony was presented to the trial court and became part of the record, the Bank was entitled to rely on it as evidence in support of its claim for prejudgment interest based in equity.   While we agree with the general proposition that "evidence admitted into a case is available for all purposes, and every party is entitled to the benefit of all evidence whether produced by him or his adversary," we find that this in no way excused the Bank's failure to raise equity arguments at trial or in posttrial pleadings so as to give the trial court an opportunity to consider those arguments and to preserve the issue for review on appeal.   *Dudanas v. Plate*, 44 Ill. App. 3d 901, 909 (1976).   We further reject the Bank's assertion that this argument was not forfeited on the basis that Michele's posttrial "proposed findings of fact and conclusions of law" referenced case law that pertained to prejudgment interest based on equitable considerations. Michele does not appeal the issue of prejudgment interest and the Bank cannot now adopt Michele's posttrial pleading arguments as its own, where, as discussed, the Bank had ample opportunity to address this argument in its own posttrial brief before the trial court but nevertheless failed to do so.   Therefore, we find that the Bank forfeited review of its equity arguments on

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

appeal. Accordingly, we need only determine whether the trial court abused its discretion in denying prejudgment interest pursuant to the Act.

¶ 117 Turning our attention to the trial court's decision in denying prejudgment interest pursuant to the Act, the Bank argues that the trial court erred in declining to find that the Taylors' and Michael's conduct was unreasonable and vexatious. The Bank contends that the record supports the finding that their conduct in withholding assets belonging to the Erla Trust was unreasonable and vexatious, arguing that how they had treated Erla during her lifetime was irrelevant to the proper application of the Act. The Bank posits that, had the Taylors and Michael simply returned the assets to the Erla Trust after Erla's death in 2003, instead of putting forth "bogus defenses" in an attempt to retain these assets, seven-and-a-half years of litigation could have been avoided. The Bank further argues that prejudgment interest was warranted because the misappropriated funds were retained by the Taylors and Michael without Erla's knowledge.

¶ 118 The Taylors counter that the Bank's claim for prejudgment interest based on the Act fails as a matter of law because the Act was inapplicable to non-contract claims. They argue that, even if the Act applied in the instant case, sufficient evidence in the record supports the trial court's finding that they did not act willfully and vexatiously. The Taylors contend that the Bank failed to prove that they acted maliciously or willfully, and that judgment was entered against them only because they failed to overcome the presumption of fraud by clear and convincing evidence.

¶ 119 Michael argues, like the Taylors, that the Act does not permit an award of prejudgment interest on non-contract claims such as those brought by the Bank in the instant case. Michael further contends that the trial court did not misapply the Act and that the court properly considered

- 62 -

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

the totality of the circumstances in finding the absence of unreasonable and vexatious conduct. Michael further asserts that the mere filing of an appearance before the court and conducting a defense in the litigation did not constitute unreasonable and vexatious conduct, where legitimate questions existed as to the amounts that were subject to recovery pursuant to the Bank's recovery citation.

¶ 120  We find that the trial court properly denied prejudgment interest pursuant to the Act. Generally, prejudgment interest is recoverable only when it is contracted by the parties or authorized by statute.  *Continental Casualty Co. v. Commonwealth Edison Co.*, 286 Ill. App. 3d 572,577 (1997).   The disputing parties did not enter into an agreement providing for the award of prejudgment interest; thus, a potential award of prejudgment interest is only available to the Bank pursuant to the Act.   Under the Act, the Bank would be entitled to interest in the event of an "unreasonable and vexatious delay of payment" by the Taylors and Michael.   See 815 ILCS 205/2 (West 2010).   Whether a party's conduct is "unreasonable and vexatious" is a question of fact and will not be disturbed unless it is contrary to the manifest weight of the evidence.   *Charles Selon & Associates, Inc.*, 103 Ill. App. 3d at 801.   As noted, the trial court declined to find that the Taylors' and Michael's failure to remit funds taken from Erla was unreasonable and vexatious.   We find that the trial court's finding was supported by the manifest weight of the evidence at trial.   The Bank asserts that had the Taylors and Michael returned the assets to the Erla Trust after Erla's death in 2003, instead of putting forth "bogus defenses" in an attempt to retain these assets, over seven years of litigation could have been avoided.   Although the Bank points to parts of the record, and the Taylors' and Michael's inability to rebut the presumption of fraud or undue

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

influence at trial, to suggest that their delay in returning the funds was unreasonable and vexatious, we find that the evidence equally supports a finding that the delay in payment was a result of litigation. See *id.* at 802 ("[m]erely conducting a defense, where there is an honest dispute as to the existence of a legal obligation, does not constitute an unreasonable and vexatious delay unless the plaintiff can establish conduct by a litigant which approximates actual fraud"); accord *Hamilton v. American Gage & Machine Corp.*, 35 Ill. App. 3d 845, 853 (1976) ("in order to collect interest on a theory of unreasonable and vexatious delay, the evidence must show that the debtor had thrown obstacles in the way of collection or by some circumvention or management of his own had induced the collector to delay taking proceedings to collect the debt longer than he would have otherwise done" (Internal quotation marks omitted.)). Indeed, following the trial, the trial court ruled in favor of the Taylors and Michael on the issues of the Florida condominium and the gifting program funds. The Bank does not identify what "bogus defenses" the Taylors and Michael advanced in an attempt to delay the return of the funds, nor has it demonstrated any actual fraud to establish their conduct as unreasonable and vexatious. Thus, we cannot conclude that an opposite conclusion is clearly evident, or that the trial court's finding that there was no unreasonable and vexatious delay, was arbitrary or not based on evidence. See *Continental Casualty Co.*, 286 Ill. App. 3d at 576. Likewise, we reject the Bank's assertion that prejudgment interest was warranted under the Act because the Taylors and Michael retained funds "without the owner's knowledge" (815 ILCS 205/2 (West 2010)), where the record reveals that Erla was aware of, and signed documents pertaining to, some of the transactions at issue in this case–including those relating to the gifting program, the June 1990 warranty deed for the Florida condominium, the second

- 64 -

1-11-2219)
1-11-2258)
1-12-2476)
1-12-2715) Cons.

amendment to the Erla Trust, the 1997 appointment related to the Max Trust, the 1994 POA and the 1997 POA. Therefore, we hold that the trial court's findings were not against the manifest weight of the evidence. Accordingly, the trial court did not abuse its discretion in denying the Bank's request for prejudgment interest on the recovered assets. But *cf. In re Estate of Burren*, 2013 IL App (1st) 120996, ¶¶ 47-48 (finding no abuse of discretion by the trial court's decision to award prejudgment interest to the estate under the circumstances of the case).

¶ 121 In summary, we reverse the trial court's finding that the Taylors misappropriated $18,770 from the Morgan Stanley account that belonged to Erla, reverse the trial court's finding that Erla's Florida condominium should not be subjected to recovery, remand the matter solely for further proceedings in accordance with the reversals, but affirm all other aspects of the court's May 16, 2011 judgment. We affirm the trial court's August 10, 2012 order approving the Bank's distribution plan.

¶ 122 Affirmed in part and reversed in part; cause remanded.